Donna M. DOLLY, Adm.,
et al., Plaintiffs,

v.

**OLD REPUBLIC INS. CO., Defendant.**

No. 5:00CV1685.

United States District Court,
N.D. Ohio,
Eastern Division.

May 8, 2002.

Kenneth L. Gibson, Weick, Gibson & Lowry, Cuyahoga Falls, Stanley P. Aronson, Aronson & Associates, Akron, OH, for Plaintiffs.

Paul D. Eklund, Davis & Young, Cleveland, OH, for Defendant.

## MEMORANDUM OPINION

DOWD, District Judge.

This case involves a claim for wrongful death damages and seeks coverage under two insurance policies issued by the defendant to plaintiff's decedent's employer. Fully-briefed cross-motions for summary judgment are presently before the Court. For the reasons and in the manner discussed below, defendant's motion (Doc. No. 23) is denied and plaintiff's motion (Doc. No. 19) is granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

On or about June 20, 1999, the plaintiff's decedent, Warren D. Dolly, an employee of Con–Way Central Express ("Con–Way")[1] and an insured under the policies at issue here,[2] was severely injured as a result of a motor vehicle accident caused by the negligence of Everette Yoho in Summit County, Ohio.[3] Yoho had coverage for $100,000 under a policy provided by The Hartford Insurance Co. Mr. Dolly died on or about June 29, 1999 as a result of the injuries he sustained. At the time he was 47 years

---

1. Warren Dolly was employed as a long-distance truck driver for Con–Way, a subsidiary of CNF Transportation, Inc. ("CNF"), the named insured on the two policies at issue here. He operated out of the Con–Way terminal in Alliance, Ohio.

2. Under *Scott–Pontzer v. Liberty Mutual Fire and Ins. Co.*, 85 Ohio St.3d 660, 710 N.E.2d 1116 (1999), where an employer is the actual named insured, employees can also be considered "persons insured."

3. The parties have stipulated that Mr. Dolly was operating a 1985 Harley Davidson motorcycle northbound on Darrow Road approaching the intersection of Eastlawn Avenue in the City of Akron, Ohio, at the same time Everette Yoho was operating a 1996 Ford Crown Victoria automobile southbound on Darrow Road approaching the same intersection from the opposite direction as Dolly. At the intersection, Dolly's motorcycle collided with Yoho's vehicle when Yoho failed to yield the right of way while making a left turn.

old and was survived by the plaintiff (his wife of 23 years), his 19 year old son Eric, his mother Lita Dolly, and numerous brothers, sisters, nieces and nephews.

On July 6, 2000, plaintiff Donna M. Dolly, administratrix of the Estate of Warren Dolly, filed this case for wrongful death damages against defendant Old Republic Insurance Company. In her complaint, amended on May 18, 2001 (*see* Doc. No. 32), plaintiff alleged that on or about October 1, 1998, the defendant, a citizen of the State of Pennsylvania, issued two policies of insurance to CNF. The primary insurance policy is Trucker's Policy No. MWTT13026 ("the primary layer"), effective October 1, 1998 to October 1, 2001. This primary layer provides the insureds with liability coverage for claims up to $3 million per accident. In addition to the primary layer, there is an Umbrella and Excess Liability Policy No. MWZU15641 ("the excess layer"), effective for the same period. This excess layer has limits of $5 million. Both policies insure vehicles, including vehicles registered in and primarily located in the State of Ohio.

The primary policy also provides $500,000 in uninsured/underinsured motorist ("UM/UIM") coverage. It is plaintiff's position that this policy is governed by O.R.C. § 3937.18 which, at the time, required the defendant to offer UM/UIM coverage in the same amount as the liability coverage. Plaintiff argues that, because defendant offered only $500,000 in coverage, this was a violation of the statute, which results in $3 million of UM/UIM coverage being read into the policy by operation of law. Defendant, however, asserts that this primary policy is not subject to the statute because it is *self*-insurance and that there was, therefore, no requirement to offer UM/UIM coverage in any amount, even though defendant *did* offer

$500,000 of such coverage. Therefore, in defendant's view, UM/UIM coverage in the amount of $3 million cannot be read into the primary policy by operation of law.

With respect to the excess policy, there is no dispute that there was no offer of UM/UIM coverage, even though there should have been under the provisions of the relevant statute. Therefore, by operation of law, UM/UIM coverage of $5 million is read into the excess policy. *Abate v. Pioneer Mut. Cas. Co.*, 22 Ohio St.2d 161, 258 N.E.2d 429 (1970). The question with respect to that policy is whether the retained limits in the liability portion also operate to limit the UM/UIM coverage implied by operation of law. In other words: *when* is the excess layer of insurance triggered?

The parties have stipulated that damages are in the amount of $2.35 million. The defendant admitted coverage (under the express UM/UIM provisions of the primary layer) in the amount of $500,000, less a $100,000 set-off for recovery under the tortfeasor's policy.[4] Defendant has paid the sum of $400,000 to the Estate of Dolly, with interest being waived. Therefore, plaintiff now seeks to recover from the defendant the difference between $500,000 and $2.35 million.

## II. JURISDICTION

Although this case was assigned to the expedited track, resolution has taken longer than anticipated because the Court has struggled with a couple of threshold issues, one being whether there is truly diversity jurisdiction.

This case was filed under 28 U.S.C. § 1332. Ohio's *Scott–Pontzer* decision has spawned a multiplicity of cases filed in federal court under the diversity jurisdic-

---

**4.** With the consent of the defendant, The Hartford has settled plaintiff's claims against Yoho and The Hartford by tendering plaintiff its limits of $100,000.

tion statute, since the insurance company defendants are often citizens of other states. For purposes of diversity, an entity such as an insurance company is a citizen of both its state of incorporation and the state where it has its principal place of business. 28 U.S.C. § 1332(c)(1).

■ An insurer's citizenship can also be predicated on the citizenship of the insured. For that reason, some judges of this district have recently remanded cases to state courts from which they were removed, finding that the employer/insured was a citizen of Ohio, which destroys complete diversity. *See e.g., Kormanik v. St. Paul Fire and Marine Ins., Co.,* 2001 WL 1850890 (N.D.Ohio Oct. 19, 2001) (Polster, J.) (the citizenship of the insured is deemed to be the citizenship of the insurer); *accord, Verhovec v. Wausau Ins. Co.,* No. 5:01 CV 0662, slip op. (N.D.Ohio Nov. 14, 2001) (Polster, J.); *Kohus v. Hartford Ins. Co.,* 2001 WL 1850889 (N.D.Ohio Nov. 19, 2001) (Matia, J.); *Comella v. St. Paul Mercury Ins. Co.,* 177 F.Supp.2d 704 (N.D.Ohio 2001) (O'Malley, J.), *appeal dismissed* 2002 WL 467940, 33 Fed.Appx. 737 (6th Cir.2002); *Stubbins v. Nationwide Agribusiness,* 181 F.Supp.2d 805 (N.D.Ohio 2002) (Carr, J.); *Griffin v.*

*Wausau Ins. Co.,*—F.Supp.2d—, 2002 WL 312819, No. 3:01 CV 7611 (N.D.Ohio Feb. 15, 2002) (Katz, J.); *Butler v. Zurich American Ins. Co.,* 184 F.Supp.2d 695 (N.D.Ohio 2002) (Katz, J.). *See also, Monahan v. American States Ins. Co.,* No. 5:00 CV 1191, slip op. (N.D.Ohio Dec. 20, 2001) (Economus, J.) (dismissing for lack of subject matter jurisdiction).[5] *But see, Redmon v. Sumitomo Marine Management (U.S.A.), Inc.,* 179 F.Supp.2d 787 (N.D.Ohio 2001) (Aldrich, J.) (denying motion to remand, reaching opposite conclusion from the above-cited remanded cases);[6] *Fidelity & Guaranty Ins. Underwriters, Inc. v. Nocero,* 2001 WL 1792448 (N.D.Ohio Dec. 13, 2001) (Gaughan, J.)[7] (denying motion to dismiss after concluding that a "direct action" under 28 U.S.C. § 1332(c)(1) does not include an action for declaratory judgment brought by an insurer against a claimed insured).[8]

This Court recently adopted the reasoning of *Kormanik* and its progeny for instances where the employer/insured was a citizen of Ohio. *See Jividen v. United States Fire Insurance Co.,* No. 4:01 CV 0726, slip op. (N.D.Ohio Apr. 29, 2002); *Jividen v. St. Paul Fire & Marine Ins.*

---

5. *Monahan* was filed in this court in the first instance and could, therefore, not be remanded to any state court. The dismissal, however, was premised on the same reasoning as in *Kormanik* and the other remanded cases. The instant case is similar to *Monahan* in that it, too, was filed directly in this court. *Monahan* is presently on appeal. (6th Cir. No. 02–3117).

6. On March 28, 2002, *Redmon* was dismissed on the parties' representation that it had settled. (Doc. No. 21).

7. On the same day, the court granted plaintiff's motion for summary judgment on its complaint for declaratory relief and denied defendant's motion. (Doc. Nos. 29, 30). This decision is presently on appeal. (6th Cir. No. 02–3049).

8. Although this Court cannot claim to have examined *Fidelity* very carefully, it does have an immediate question as to whether it could have been dismissed anyway under the teaching of *Allstate Ins. Co. v. Mercier,* 913 F.2d 273 (6th Cir.1990) (district court should not have exercised its discretionary jurisdiction given the lack of factual record and given that there was a better and more effective alternative remedy through declaratory judgment action in state court); *see also, Scottsdale Ins. Co. v. Roumph,* 211 F.3d 964 (6th Cir.2000), *reh'g and suggestion for reh'g en banc denied,* 211 F.3d 964 (6th Cir.2000) (concluding that district court properly exercised its discretion where interpretation of the endorsement at issue involved a previously undetermined question of state law).

*Co.,* No. 1:02 CV 191 (N.D.Ohio Apr. 29, 2002).

There is no doubt that the instant defendant, in its own corporate capacity, is not a citizen of Ohio. An inquiry by the Court has established (*see* Doc. Nos. 48 and 49) that CNF and Con–Way, both employer/insureds under the relevant policies, are citizens of California and of Delaware and Michigan, respectively. Therefore, considering the citizenship of these entities alone there is complete diversity.

█ The question here is whether the citizenship of the decedent, also deemed an "insured" under *Scott–Pontzer,* can be applied to defeat diversity jurisdiction. Given the problem that *Scott–Pontzer* cases are becoming for federal courts,[9] this is an attractive theory since, like the cases where the Ohio citizenship of the employer/insured destroys diversity, the Ohio citizenship of the employee/insured would also destroy diversity and require either remand or dismissal. However, this Court has recently adopted the view that this interpretation of *Scott–Pontzer,* even if arguably a justifiable interpretation, would carry that case too far. *See, Fellows–Knox v. Genesis Insurance Co.,* 2002 WL 857217 (N.D.Ohio 2002).[10]

Therefore, the Court is satisfied that, under the facts of this case, there is true diversity of citizenship which precludes dismissal under *Kormanik* and its progeny.

### III. OHIO SUPREME COURT CERTIFICATION

The Court had also raised the possibility of certifying issues to the Ohio Supreme Court.[11] On October 11, 2001, after the parties had stipulated that the damages in this case are $2.35 million, the Court out-

9. For an example of the criticism surrounding the *Scott–Pontzer* decision, see *Lawler v. Fireman's Fund Ins. Co.,* 163 F.Supp.2d 841 (N.D.Ohio 2001) (Gwin, J.).

10. A footnote in *Comella* originally suggested that the citizenship of employee/insured could also be attributed to the insurance company defendant to defeat diversity. However, that same branch of the court has recently decided otherwise in reliance on *Fellows–Knox. See Villa v. Michigan Mutual Ins. Co.,* No. 1:01 CV 1707, slip. op. (N.D.Ohio March 20, 2002) (O'Malley, J.).

Similarly, the same branch of the court which first decided *Kormanik* recently denied a motion to remand after finding that the employer/insured was a Michigan resident. *See Gooden v. National Union Fire Ins. Co.,* No. 5:01 CV 2138, slip op. (N.D.Ohio Nov. 14, 2001) (Polster, J.); *see also, Fleshman v. Michigan Mut. Ins. Co.,* No. 1:01 CV 2389, slip op. (N.D.Ohio April 16, 2002) (Matia, J.) (same).

11. Two other judges of this court have certified *Scott–Pontzer* issues to the Ohio Supreme Court. That court declined to accept certification of *Comella, supra.* Judge O'Malley subsequently followed the *Kormanik* reasoning and remanded *Comella.* The Sixth Circuit dismissed the appeal.

The Ohio Supreme Court did accept certification of *Monahan, supra,* on the following question: "Where parties to an insurance contract negotiate specific clauses limiting UM/UIM coverage by way of an Ohio uninsured motorist coverage form, for instance, a subrogation clause and [an] 'excess insurance' clause, but due to a deficiency in the offer, the UM/UIM coverage is provided by operation of law, are the limiting clauses in the Ohio uninsured motorist coverage form rendered invalid or does the provision of the UM/UIM coverage by operation of law only affect the amount of coverage provided?" *Estate of Monahan v. Am. States Ins. Co.,* 93 Ohio St.3d 1449, 756 N.E.2d 114 (2001). However, as already noted, Judge Economus ultimately decided to follow *Kormanik;* he ordered the case dismissed for lack of subject matter jurisdiction and then vacated the certification order. His dismissal order is presently on appeal to the Sixth Circuit. On February 6, 2002, the Supreme Court of Ohio dismissed the certified case. 94 Ohio St.3d 1448, 762 N.E.2d 367 (2002) (Table).

lined its view of the issues which remain to be resolved in this case:

(1) Is the Old Republic Trucker's Policy No. MWTT 13026 an "automobile liability or motor vehicle liability policy of insurance" as defined in Ohio Rev. Code § 3937.18(L) or is it "practical self-insurance" not subject to that statute?

(2) If the Policy is subject to Ohio Rev.Code § 3937.18(L), is the Limit of Liability for UM/UIM contained in the policy (i.e., $500,000) valid?

(3) Is the UM/UIM coverage implied into defendant's umbrella policy No. MWZU 15641 by operation of law subject to the Retained Limits provisions in the liability portion of that policy?

(4) If the UM/UIM coverage implied into defendant's umbrella policy by operation of law is subject to the Retained Limits in the liability portion of that policy does the coverage begin after exhaustion of the $500,000 Limit of Liability in the primary policy or does it begin only after the damages exceed $3 million?

(Doc. No. 46). The Court asked the parties "to jointly propose to this Court a question or questions, based on the issues remaining for resolution, which they believe can be certified to the Ohio Supreme Court." Neither party responded and, of course, the issues above are not in a form that can be certified with any hope of success. Therefore, the Court now declines to make a request for certification, choosing instead to simply decide the issues in this "expedited" case that is now almost two years old.

### IV. LEGAL STANDARD

 This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As a federal court located in Ohio exercising diversity jurisdiction, this Court must apply federal procedural law and Ohio substantive law. See Hisrich v. Volvo Cars of N. America, 226 F.3d 445, 446 (6th Cir.

2000). Accordingly, this Court must follow the Ohio Supreme Court's decisions that address the relevant issues. See Meridian Mut. Ins. Co. v. Kellman, 197 F.3d 1178, 1181 (6th Cir.1999). In the event that the Ohio Supreme Court has not addressed a substantive issue, this Court must ascertain Ohio substantive law from all relevant sources. See Hisrich, 226 F.3d at 449 n. 3.

Federal law provides the relevant legal standard with respect to summary judgment, which is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." U.S. v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). See, e.g., U.S. v. Hodges X–Ray, Inc., 759 F.2d 557, 562 (6th Cir.1985) and cases cited therein. The Court's favorable treatment of facts and inferences, however, does not relieve the nonmoving party of the responsibility "to go beyond the pleadings" to oppose an otherwise properly supported motion for summary judgment under Rule 56(e). See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party satisfies his or her burden to show an absence of evidence to support the nonmoving party's case, Celotex Corp. v. Catrett, 477 U.S. at 323, 106 S.Ct. 2548, the party in opposition "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Although the showing required of the nonmoving party

by Rule 56 does not go so far as to require that all opposition evidence be in a form admissible at trial, the rule does require the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves . . . ." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. General averments or conclusory allegations of an affidavit, however, do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Furthermore, unsworn statements and affidavits composed of hearsay and non-expert opinion evidence, "do not satisfy Rule 56(e) and must be disregarded." *See Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968–69 (6th Cir.1991) (quoting *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 264 (6th Cir.1979) and citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 n. 17, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts . . . earlier deposition testimony." *Reid v. Sears Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.*, 747 F.2d 209, 215 (6th Cir.1984)).

On a motion for summary judgment, the Court will consider "[o]nly disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505. Non-material facts will not be considered. Neither will the judge attempt to weigh the material evidence or determine its truth. *Anderson v. Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. 2505. The judge's sole function will be to determine whether there is a genuine issue for trial such that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* (citations omitted).

Where the nonmoving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. at 323, 106 S.Ct. 2548 (equating the standard for judgment as a matter of law under Rule 50(a) with the summary judgment standard of Rule 56). If the evidence is "merely colorable," or is "not significantly probative," the Court may decide the legal issue and grant summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) (*per curiam*) and *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)). " 'The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby*, 477 U.S. at 250, 106 S.Ct. 2505.

## V. DISCUSSION

As discussed in detail below, there are two policies of insurance, both of which were issued by defendant Old Republic to the employer CNF and its subsidiaries. In addition, the parties have stipulated that plaintiff's damages are $2.35 million

and that Old Republic has already paid $400,000, which constitutes the difference between the $500,000 of UM/UIM coverage which Old Republic admits to owing, less the $100,000 recovered from the tortfeasor.

One of the two policies is a primary layer of self-insurance, while the other is an excess layer of true insurance. Depending upon how one interprets each of the policies in light of the relevant Ohio statute, there are three possible results:

(1) If the Ohio statute applies to the primary layer of self-insurance, resulting in UM/UIM coverage in an amount equal to the liability coverage (i.e., $3 million), then the *self-insured employer* (CNF and/or its subsidiary) will owe plaintiff $1.95 million in additional damages; *or*

(2) If the primary layer is not implicated, *Old Republic* will owe the plaintiff either:

(a) $1.95 million, if the $3 million liability limit in the policy *is not* applicable, *or*

(b) nothing, if the $3 million liability limit in the policy *is* applicable.

Under both scenario (1) and (2)(a), plaintiff would recover an additional $1.95 million, in the first instance from CNF and in the second from Old Republic. Under scenario (2)(b), plaintiff would recover nothing in additional damages.

**12.** One might presume that, since this was a renewal policy, the prior effective period was also three years, i.e., October 1, 1995 to October 1, 1998. However, other materials submitted to the Court suggest that the original period began on October 1, *1997. See* Deductible Program Agreement, Doc. No. 23, Exh. 4, Addendum # 3 [28th page of the *unnumbered* exhibit]. Under *Ross v. Farmers Ins. Group*, 82 Ohio St.3d 281, 695 N.E.2d 732 (1998) (syllabus), the statutory version in effect as of October 1, 1997 must be applied.

Therefore, as is apparent from the above description of the possible outcomes, the stakes are high for everyone.

## A. The Parties' Positions Regarding the Relevant Policies

### 1. The Primary Layer

The primary policy of insurance is Trucker's Policy No. MWTT13026 renewed by Policy No. MWTT13027, effective October 1, 1998 to October 1, 2001,[12] which provided Con–Way and CNF with automobile liability coverage for claims up to $3 million per accident. *See* Doc. No. 23, Exh. 1. The policy contained the Limits and Deductible Endorsement No. U–917 (8–89) Form E which provides, in relevant part, as follows:

In consideration of the premium charged, it is agreed and understood that Section II–Liability, C. Limit of Insurance of forms CA 102 (1–87), CA 106d (3–92), CA 109 (12–90), CA 193 (12–93), CA 199 (7–97), and A 153 (10–81) are amended as follows:

A. Regardless of the number of covered autos, insureds, claims made on vehicles involved in the accident, the most we will pay for all damages, including any Supplementary Payments or Out of State Coverage Extensions resulting from any one accident is the Limit of Insurance For Liability Coverage shown in the Declarations.

This is the version enacted on September 3, 1997. *See, e.g., Purvis v. Cincinnati Ins. Co.*, No.2001–CA–104, 2002 WL 538926, at *6, n. 2 (Ohio App. 2 Dist. April 12, 2002) (noting that although the policy being sued under was issued in 1998, because it was a renewal policy, the court had to look to the reduction in UM/UIM coverage executed in 1995 with the original policy and, similarly, apply the 1994 version of the statute which was in place at the time).

All "bodily injury" and "property damage" resulting from continuous or repeated exposure to substantially the same conditions will be considered as resulting from one "accident".

B. An amount equal to the Limit of Insurance For Liability Coverage including Supplementary Payments or Out of State Coverage Extensions shall be deducted from the amount of any loss as a result of each accident reported under this Policy. It is further agreed that expenses incurred by the Insurer arising out of a duty to defend regardless of liability shall be subject to the deductible amount. Payments under the deductible will reduce the applicable Limit of Insurance For Liability Coverage under this Policy. The deductible amount may be satisfied by loss payments and/or Supplementary Payments and/or Out of State Coverage Extensions from any source as defined in this Policy.

(Doc. No. 23, Exh. 1). It is the defendant's position that this so-called "Matching Deductible" Endorsement,[13] along with an Indemnity Agreement,[14] a Claim Service Contract,[15] and letters of credit furnished by CNF for the benefit of Old Republic,[16] all made this a "self-insurance"

policy which, defendant argues, is not subject to the terms of O.R.C. § 3937.18. This statute requires insurers to offer uninsured motorist ("UM") and underinsured motorist ("UIM") coverage equivalent to the automobile liability or motor vehicle liability coverage. O.R.C. § 3937.18(A)(1) and (2). The primary policy at issue here contained an endorsement captioned "Ohio Uninsured Motorists Coverage—Bodily Injury" which had only a $500,000 per accident limit. (Doc. No. 23, Exh. 1). There is no dispute that the defendant paid plaintiff $400,000 under this endorsement, allowing for a set-off of the $100,000 which was paid by the tortfeasor's insurance. The defendant asserts that this is all it owes.

It is the plaintiff's position that, because of new language added to the statute effective September 3, 1997, the Trucker's Policy No. MWTT13026 is *not* self-insurance but is, rather, a policy of insurance governed by the requirements of O.R.C. § 3937.18. In the alternative, plaintiff takes the position that, if the primary layer is not a policy of insurance, then it is an insurance pool, which is also not exempt from the statute. It is also the plaintiff's position that the provisions of the statute were violated when the defendant did not offer UM/UIM coverage in the amount of the liability limits of the policy (i.e., $3

---

**13.** A "matching-deductible" endorsement establishes a deductible equal to the policy limit.

**14.** A Deductible Program Agreement # V156 ("the Indemnity Agreement") (*see* Doc. No. 23, Exh. 4) was executed by CNF and Old Republic and provides, in pertinent part, that CNF will hold Old Republic harmless "from all losses, costs and expenses which Old Republic may incur or suffer under the Policies..." and that CNF will provide Old Republic with letters of credit as security for payment of such losses, costs and expenses. Defendant takes the position that "the Indemnity Agreement reinforces the Matching De-

ductible Endorsement by providing that CNF retains 100% of the risk under the Primary Layer of the CNF Program." (Doc. No. 23, Memorandum in Support of Motion, at 6).

**15.** This agreement was executed by Constitution State Service Company ("CSSC") and Old Republic for the benefit of CNF. Under the agreement CSSC served as a claims adjuster and administered the policies. (*See* Doc. No. 23, Exh. 5).

**16.** These letters of credit served as security for CNF's retention of risk under the CNF insurance program. (*See* Doc. No. 23, Exh. 6).

million), but instead limited the UM/UIM coverage to $500,000. Plaintiff asserts that the legal consequence of the violation is that UM/UIM coverage is provided by operation of law in the same amount as the general liability limit, that is, $3 million.

### 2. The Excess Layer

In addition to the Trucker's Policy described above, there is also an umbrella policy, the Umbrella and Excess Liability Policy No. MWZU15641. *See* Doc. No. 23, Exh. 2. This policy is excess over the primary policy and has policy limits of $5 million. Under this policy, the defendant "agrees to pay on behalf of the Insured the Ultimate Net Loss in excess of the Retained Limit hereinafter stated . . . [.]" (Doc. No. 23, Exh. 2, at page 2). Section V of this policy contains the "Limits of Liability" provision which states that "[t]he Company's liability shall be only for the Ultimate Net Loss in excess of the Insured's Retained Limit" which, in this case, is $3 million per occurrence. (*Id.* at page 9).

The defendant concedes that, because of failure to comply with O.R.C. § 3937.18, the excess policy provides UM/UIM coverage by operation of law. However, the defendant argues that the amount of this coverage is limited by Section V of the policy which applies to all provisions of the policy, including UM/UIM coverage arising by operation of law. Therefore, it is defendant's position that the excess layer is not triggered until plaintiff's damages exceed $3 million. Since the parties have stipulated that plaintiff's damages are $2.35 million, defendant asserts that the

excess layer does not "drop down" to cover the difference between $500,000 (already recovered by the plaintiff under the primary policy and the tortfeasor's policy) and $2.35 million.

Plaintiff rejects defendant's argument insisting that it would create a gap in UM/UIM coverage that is not present on the liability side of the policy. Plaintiff argues that Section V of the excess policy does not apply to limit the UM/UIM coverage implied by law. In other words, plaintiff's position is that UM/UIM coverage provided by operation of law is *not* excess in nature, but is, rather, primary and subject only to set-off of payments already received from other sources. Plaintiff argues that the excess layer must "drop down" after exhaustion of the $500,000 primary UM/UIM coverage.

### B. O.R.C. § 3937.18

The only issues raised in this case center on the legal interpretation of O.R.C. § 3937.18. Although § 3937.18 has been significantly revised, effective October 31, 2001,[17] the Court must apply the statutory version in effect at the time of the parties' contract because subsequent statutory amendments have not expressly been made retroactive. *Ross v. Farmers Ins. Group*, 82 Ohio St.3d 281, 695 N.E.2d 732 (1998) (syllabus).

Although the parties have uniformly referred to October 1, 1998 as the relevant date, the Court is of the view that it is October 1, *1997*. *See*, n. 12, *supra.* Either way, the statute enacted effective September 3, 1997 controls. It provided in pertinent part:

---

**17.** It is interesting to note, however, that the October 2001 amendment was intended to, *inter alia:* (1) eliminate any mandatory offer of uninsured and/or underinsured motorist coverage(s); (2) eliminate the possibility of UM/UIM coverage(s) being implied as a matter of law in any insurance policy; (3) eliminate the requirement of a written offer, selection, or rejection form for UM/UIM coverage(s); and (4) supersede the holdings of various Ohio Supreme Court cases, including *Linko v. Indemnity Ins. Co. of N. America*, 90 Ohio St.3d 445, 739 N.E.2d 338 (2000) and *Scott–Pontzer, supra,* and their progeny.

(A) No automobile liability or motor vehicle liability policy of insurance insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle shall be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state unless both of the following coverages are offered to persons insured under the policy due to bodily injury or death suffered by such insureds:

(1) Uninsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage . . . .

\* \* \* \* \* \*

(2) Underinsured motorist coverage, which shall be in an amount of coverage equivalent to the automobile liability or motor vehicle liability coverage . . . .

(B) Coverages offered under division (A) of this section shall be written for the same limits of liability. No change shall be made in the limits of one of these coverages without an equivalent change in the limits of the other coverage.

(C) A named insured or applicant may reject or accept both coverages as offered under division (A) of this section, or may alternatively select both such coverages in accordance with a schedule of limits approved by the superintendent. . . . A named insured's or applicant's rejection of both coverages . . . or . . . selection of such coverages in accordance with the schedule of limits . . . shall be in writing and shall be signed by the named insured or applicant. . . . [Such writing] shall be effective on the day signed, shall create a presumption of an offer of coverages consistent with division (A) of this section, and shall be binding on all other named insureds, insureds, or applicants.

Unless a named insured or applicant requests such coverages in writing, such coverages need not be provided in or made supplemental to a policy renewal or replacement policy where a named insured or applicant has rejected such coverages in connection with a policy previously issued to the named insured or applicant by the same insurer. . . .

\* \* \* \* \* \*

(K) As used in this section, "uninsured motor vehicle" and "underinsured motor vehicle" do not include any of the following motor vehicles:

\* \* \* \* \* \*

(4) A motor vehicle self-insured within the meaning of the financial responsibility law of the state in which the motor vehicle is registered.

(L) As used in this section, "automobile liability or motor vehicle liability policy of insurance" means either of the following:

(1) Any policy of insurance that serves as proof of financial responsibility, as proof of financial responsibility is defined by division (K) of section 4509.01 of the Revised Code, for owners or operators of the motor vehicles specifically identified in the policy of insurance.

(2) Any umbrella liability policy of insurance.

Plaintiff relies on the September 1997 addition of subsection (L) to the statute to argue that the primary layer of insurance is covered by subsection (A) of the statute. Defendant, on the other hand, asserts that the primary layer is *self*-insurance and, as such, not subject to subsection (A).[18]

---

**18.** The Court notes that although section (A) requires the offer of UM/UIM coverage to

## C. Analysis

### 1. Is the primary layer an "automobile liability or motor vehicle liability policy of insurance" subject to § 3937.18 or is it excluded self-insurance?

Defendant relies on *Lafferty v. Reliance Ins. Co.*, 109 F.Supp.2d 837 (S.D.Ohio 2000) and *Grange Mut. Cas. Co. v. Refiners Transport & Terminal Corp.*, 21 Ohio St.3d 47, 487 N.E.2d 310 (1986) to argue that the primary layer is "practical self-insurance" not subject to § 3937.18.

In opposition, plaintiff asserts that these cases construed pre–1997 versions of the statute and that, under the new subsection (L), the issue is solely whether the primary layer falls within the phrase "[a]ny policy of insurance that serves as proof of financial responsibility as [that term] is defined by ... section 4509.01 of the Revised Code for owners or operators of the motor vehicles specifically identified in the policy of insurance[.]" Plaintiff also argued at the hearing on these motions in April 2001 that the new subsection (K) buttresses her reliance upon subsection (L) as support for her position that self-insurance used to meet Ohio's financial responsibility law is subject to the UM/UIM requirements.

■ Turning first to subsection (K), the Court disagrees with plaintiff that this helps support her position that the self-insurance *at issue here* is subject to the statute. The Court concludes that there are times when self-insurance is considered "insurance" for purposes of this statute, but not under the circumstances found in this case.

Before subsection (K) was enacted, there were Ohio cases that held that a tortfeasor who was self-insured was *uninsured* for purposes of § 3937.18. That is, if a self-insured motorist caused an accident that injured another person, that injured person could recover under the UM/UIM coverage of *his own* insurance because, under that case law, the tortfeasor was uninsured. *See, e.g., Jennings v. City of Dayton*, 114 Ohio App.3d 144, 682 N.E.2d 1070 (1996). All subsection (K) does is to clarify that self-insurance is insurance when the *tortfeasor* is the self-insured. Thus, under subsection (K), if the tortfeasor has $100,000 of self-insured liability coverage and the injured person has $90,000 in damages, the tortfeasor's "insurance" will cover that completely. Under the former Ohio cases, that $100,000 would *not* have been available from the tortfeasor, but *would* have been available from the injured person's UM/UIM insurance. Clearly, subsection (K) was enacted to eliminate this somewhat ridiculous development in the law.

■ Finding no help for plaintiff in subsection (K), the Court turns to a closer examination of subsection (L)(1) which refers to "any policy of insurance that serves as proof of financial responsibility" under Ohio's financial responsibility statute. Plaintiff's argument focuses on the "financial responsibility" aspect of this subsection. She asserts that, since the self-insurance program of the defendant is used to meet Ohio's financial responsibility laws, it comes under the coverage of § 3937.18(A) requiring the offer of UM/UIM coverage. The Court, however, concludes that this ignores the clear requirement that there be a "policy *of insurance*." Here is where case law, even some that pre-dates the relevant statute, provides useful guidance

---

"persons insured," a "named insured" is allowed to reject the coverage under section (C). Under *Scott–Pontzer*, plaintiff is a "person insured." Exactly how the insurer is supposed to have "offered" UM/UIM coverage to Dolly and persons like her is a mystery to the Court. This further illustrates the strangeness of the *Scott–Pontzer* decision.

on the difference between "insurance" and "self-insurance."

In *Refiners Transport, supra,* the court considered "whether an employer, who meets Ohio's financial responsibility laws other than by purchasing a contract of liability insurance, must comply with the requirements concerning uninsured motorist coverage contained in R.C. 3937.18 relative to employees injured in the course of employment while driving or occupying a vehicle owned by the employer." 21 Ohio St.3d at 48, 487 N.E.2d at 312. Although this question is much narrower than the one presented in the instant case, *Refiners Transport* nonetheless supplies definitional guidance. *Refiners Transport* adopted the result reached by the Court of Appeals for Summit County in *Snyder v. Roadway Express, Inc.,* 7 Ohio App.3d 218, 455 N.E.2d 11 (1982), which held that the UM/UIM requirements of § 3937.18 as it was then constituted were not intended to apply to self-insurers. *Refiners Transport* stated: "The [*Snyder*] court recognized ... that if the statute did apply to self-insurers, in addition to insurance carriers authorized to write motor vehicle liability insurance policies, it would result in the absurd situation where one has the right to reject an offer of insurance to ones' self ...; [and] even if applicable, we believe the insured's rejection must be presumed." 21 Ohio St.3d at 48–49, 487 N.E.2d at 312 (internal quotation marks and citations omitted). The *Refiners Transport* court explained that, although the employer's purchase of a surety bond and two excess insurance policies to meet its financial responsibility requirements did not make it a self-insurer *"in the legal sense* contemplated by R.C. 4509.45(D) and 4509.72," *id.* (emphasis added), it did make the employer a self-insurer *"in the practical sense* in that Refiners was ultimately responsible under the term of its bond either to a claimant or the bonding company in the event the bond company paid any judg-

ment claim." *Id.* (emphasis added). The court ultimately concluded that "[a]lthough public policy may well favor mandatory uninsured motorist protection for employees of self-insured employers, such a declaration must emanate from Ohio's General Assembly." *Id.* at 50, 487 N.E.2d 310. The court held "that the uninsured motorist provisions of R.C. 3937.18 do not apply to either self-insurers or financial responsibility bond principals." *Id.* at 51, 487 N.E.2d 310.

In *Lafferty, supra,* an employee of Consolidated Rail Corporation ("ConRail") was driving an employer-owned vehicle when he was struck by a pickup truck owned by Mutter's Lawn Service and operated by one of its employees. After Lafferty recovered all he could from the driver's and Mutter's insurers, he brought a claim against ConRail's insurer, Reliance Insurance Company, asserting that the Reliance policy should have included $5 million in UIM coverage which should be available to Lafferty. ConRail argued that the policy was not true insurance but, as a "fronting policy," was self-insurance not subject to the statute. The district court took time to examine this and set forth a well-reasoned description:

> ConRail requested a quote [from Reliance] on a "fronting" policy with liability limits of five million dollars and a matching deductible of five million dollars. In effect, ConRail was asking Reliance to make all filings necessary to satisfy the motor vehicle financial responsibility laws of all fifty states, and to provide claims administration services while ConRail retained the risk of loss due to liability.

109 F.Supp.2d at 838. The court further explained:

> The ConRail policy had a matching liability limit and deductible amount of five million dollars. ConRail was obli-

gated to promptly reimburse Reliance for the entire amount of any payments made under the policy, and ConRail's obligation to do so was secured by a letter of credit. In effect, ConRail was a self-insurer and Reliance was providing a service which included the defense and adjustment of claims and the use of its licenses as an insurer so that ConRail could satisfy the automobile insurance requirement of the various states in which it operated motor vehicles.

*Id.* at 841. The court also discussed and quoted from *Refiners Transport* at length and noted that "[t]wo Ohio courts have applied the rationale of *Refiners Transport* to matching deductible policies, similar or identical to the one involved in this case." *Id.* at 842, 487 N.E.2d 310 (citing *McCollum v. Continental Ins. Co.*, unreported, 1993 WL 382455 (Ohio App. 6 Dist.1993) and *DeWalt v. State Farm Ins. Co.*, unreported, No. 96CV001173 (CP Lake County, Ohio, September 11, 1997)). The *DeWalt* case was attached as an appendix to *Lafferty* since it involved the same insurance policy between the same parties, ConRail and Reliance. The *DeWalt* court noted that "ConRail did not file a certificate of self-insurance under Ohio's Financial Responsibility Act (R.C. 4509.45(D))," 109 F.Supp.2d at 845, but extended the reasoning in *Snyder* and *Refiners Transport* "one step further" to conclude "that a self-insurer *in the practical sense* is not required to comply with R.C. 3937.18." *Id.* (emphasis added)

Ultimately, the *Lafferty* court also "conclude[d] that under the matching deductible policy issued by Reliance, ConRail was a self-insurer in the practical sense and that the Reliance policy was not subject to the provisions of O.R.C. § 3937.18." *Id.*.

Other case law also provides support. For example, the Second District Court of Appeals of Ohio put it very clearly:

> As a matter of common understanding, usage, and legal definition, an insurance contract denotes a policy issued by an authorized and licensed insurance company whose primary business it is to assume specific risks of loss of members of the public at large in consideration of the payment of a premium. There are, however, other risk-shifting agreements which are not insurance contracts.

*Physicians Ins. Co. of Ohio v. Grandview Hosp. and Med. Center*, 44 Ohio App.3d 157, 542 N.E.2d 706, 707 (1988) [19] (quoting *American Nurses Ass'n v. Passaic Gen. Hosp.*, 192 N.J.Super. 486, 471 A.2d 66 (1984)). The court concluded:

> We agree with the New Jersey courts that *self-insurance is not insurance*; it is the antithesis of insurance.
>
> Insurance shifts the risk of loss from an insured to an insurer. Self-insurance "is the retention of the risk of loss by the one upon whom it is directly imposed by law or contract."

*Id.* at 158, 542 N.E.2d at 707 (emphasis added).[20]

In *McCollum*, a case relied upon by the *Lafferty* court, a "fronting agreement" al-

---

**19.** This case does not involve motor vehicle liability, but it is nonetheless useful for its brief discussion of the meaning of "insurance."

**20.** One way of looking at the "risk factor" of insurance is as follows: when one purchases a policy of insurance of any kind, the insurance company is "betting" that it will come out ahead because, although premiums have been paid, there will be no claims made, especially no catastrophic-type claims. On the other hand, the purchaser is willing to take the *chance* of losing the investment of the premium amount in return for coverage in the event of a claim, particularly a catastrophic-type claim. In a sense, the purchaser is betting against herself, but prefers that to the potential for financial ruin in the event of a large claim. Where there is self-insurance, this dynamic does not come into play because the self-insured party retains all of the risk.

most identical to the one in the instant case was involved. The court said ·that "fronting agreement" is "an insurance term indicating that an entity is renting an insurance company's licensing and ·filing capabilities in a particular state or states." *McCollum*, 1993 WL 382455, at \*3. There, RLC Corporation had a Comprehensive Liability Policy issued by Continental Insurance Company in which Continental agreed to indemnify RLC for losses up to $750,000 but only after the losses were in excess of · a "self-retained limit of $250,000." In other words, RLC was self-insured for $250,000 [21] and bought an insurance policy for amounts between $250,000 and $750,000. This policy contained no endorsements for UM/UIM coverage. There was also an "Excess Liability Policy" which had essentially the same terms. The Sixth District Court of Appeals of Ohio, relying on *Refiners Transport*, ruled that the UM/UIM requirements of the statute *did* apply to that portion of both policies which was in excess of $250,000. However, the court did *not* apply the UM/UIM requirements to the self-insured portion.[22]

Under this case law, considering § 3937.18 as a whole in light of the purpose of UM/UIM coverage, it is apparent to the Court that at least one intent of subsection (L)(1) is not to establish that self-insurance is subject to the UM/UIM offering requirement, but rather to differentiate between actual · automobile/motor vehicle liability policies and other kinds of general policies which may arguably sweep into their coverage injuries resulting from accidents involving various motorized vehicles (such as recreational vehicles not intended for use on public highways). *See, e.g., Davidson v. Motorists Mut. Ins. Co.*, 91 Ohio St.3d 262, 744 N.E.2d 713 (2001) (construing the law in effect prior to Sept. 3, 1997; reversing both the trial and appeal courts' holding that a homeowner's policy provided coverage for vehicles not subject to vehicle registration). Under the new language, undoubtedly precipitated by lower court decisions holding otherwise, a general liability policy would have to offer UM/UIM coverage only if that policy were used to "serve[ ] as proof of financial responsibility" under § 4509.01. In that

**21.** The court explained: "In the event that Continental was required to satisfy a claim as a result of the filings, RCL, pursuant to an indemnity agreement, automatically reimbursed Continental in an amount up to the self-retained limit of $250,000." 1993 WL 382455, at \*3.

**22.** On December 18, 2001, the Ohio Attorney General issued an advisory opinion which, although not directly on point, is instructive on the question of whether self-insurance *is* insurance. The precise question addressed by the opinion was "whether local school districts in conjunction with county educational service centers are authorized to form joint self-insurance pools pursuant to R.C. 2744.081." Opinion No. 2001–043, 2001 WL 1654716 (Ohio A.G. Dec. 18, 2001). The question arose when a local school was informed by a major insurance company that the company would soon stop insuring

schools. The school in question wanted to consider entering a joint self-insurance pool. However, the local prosecuting attorney feared that there was a conflict between the statutory requirement that a board of education procure liability·insurance from an insurance company licensed to do business in Ohio (O.R.C. § 3311.203(A)) and O.R.C. § 2744.081(E)(2) which states that "[a] joint self-insurance pool is not an insurance company." In several places throughout the opinion, the Ohio Attorney General draws distinctions between "insurance policies" and "self-insurance." She even cites some of the above cases for the proposition that "self-insurance is not insurance." Opinion, at \* 4. Although the topic in the opinion has no direct connection to the topic in the instant case, clearly Ohio's Attorney General is of the view that, under Ohio law, "policies of insurance" and "self-insurance" are two different things.

event, it would also have to "specifically identif[y]" the covered vehicles.[23] In other words, section (L) clarifies that, the mere fact that under certain limited circumstances policies other than actual motor vehicle liability policies might provide coverage for an insured's injuries in a motor vehicle accident, does not automatically mean that such policies are required to offer UM/UIM coverage. *See, e.g., Pickett v. Ohio Farmers Ins. Co., supra* (construing a general liability policy under § 3937.18(L) and concluding that it need not offer UM/UIM coverage because it "does not serve as proof of financial responsibility" and "has no listing of specifically identified vehicles").[24]

Having considered all of the above, the Court concludes that, even under the new subsections of § 3937.18 relied upon by the plaintiff, defendant's primary layer, the Trucker's Policy No. MWTT13026, is not subject to the UM/UIM offering requirements of that statute. Further, the mere fact that the policy does indeed offer a small amount of UM/UIM coverage does not expand the defendant's duty beyond that required by the law.[25]

**23.** There are recent decisions coming out of Ohio appellate courts which very narrowly construe the meaning of "motor vehicles *specifically identified* in the policy[.]" These seem to suggest that broad definitions of "covered autos" found in various policies do not meet the requirement. For example, in *Burkholder v. German Mut. Ins. Co.,* No. L–01–1413, 2002 WL 398223 (Ohio App. 6 Dist. March 15, 2002), the court, construing a far-mowner's/homeowner's policy, found that merely saying that "all motor vehicles owned, maintained, operated, used, loaded, or unloaded at appellants' farm" were insured for "residence employees" was not sufficient. That court held that § 3937.18(L)(1) requires that covered motor vehicles be "precisely, particularly and *individually* identified in order to meet the statutory definition." *Id.* at * 3 (emphasis added). *Accord Pickett v. Ohio Farmers Ins. Co.,* Nos.2001CA00227, 2001CA00227, 2002 WL 54698 (Ohio App. 5 Dist. Jan. 14, 2002) (similarly construing a general liability policy); *Jump v. Nationwide Mut. Ins. Co.,* No. 18880, 2001 WL 1345954, at * 2 (Ohio App. 2 Dist. Nov. 2, 2001) (construing a commercial general liability policy and a commercial umbrella liability policy and noting that "R.C. 3937.18(L)(1) significantly narrows the scope of policies that must include [UM/UIM] motorist coverage when compared with the supreme court's interpretation of the previous version of the statute [in *Scott–Pontzer* ]"). In the instant case, there is certainly no such specificity in the primary layer policy.

**24.** In fact, under the financial responsibility laws of Ohio, even some automobile liability policies would not be required to provide UM/UIM coverage if they were not used to establish financial responsibility. *See* O.R.C. § 4509.104 ("Any automobile insurance policy that does not provide liability coverage at the time of issuance of at least the minimum amounts provided under division (K) of section 4509.01 of the Revised Code for proof of financial responsibility shall contain a clear and conspicuous warning on the face of the policy stating the policy does not constitute proof of financial responsibility as required for the operation of a motor vehicle under division (A)(1) of section 4509.101 of the Revised Code.").

**25.** The Court's own research has found no case directly on point in support of this latter conclusion. In her memorandum in opposition to the defendant's motion, plaintiff makes an argument that, because the indemnity agreement accompanying the Trucker's Policy (Doc. No. 23, Exh. 4) suggests at ¶ 13 that Old Republic will "look primarily" to CNF Transportation, Inc. without limiting its right to pursue indemnification from CNF's affiliates, that this language converts CNF into an "insurer" to the extent it is insuring its subsidiaries and affiliates. Plaintiff then cites *Tyler v. Kelley,* 98 Ohio App.3d 444, 648 N.E.2d 881 (1994). This is a stretch. *Tyler* is completely distinguishable. It involved a self-insured car rental company which offered liability coverage to its rental customer (for a price). The court found that by extending liability coverage to its customer (i.e., "the public" as opposed to self-insuring its own operators), the rental company brought itself within the requirements of the UM/UIM statute, essentially turning itself into an insurance company.

**840**

The Court concludes that plaintiff has received all of the coverage required by the primary layer.[26]

### 2. Is the UM/UIM coverage imposed by operation of law on the excess layer of insurance subject to the retained limits in the liability policy?

Plaintiff wants to recover from the excess layer the difference between the $500,000 she has already recovered and the $2.35 million in stipulated damages. Defendant concedes that the excess layer includes UM/UIM coverage by operation of law (for failure to comply with § 3937.18),[27] but argues that this coverage is not triggered until the damages exceed $3 million because that is the retained limit in the excess policy. The Court disagrees with this analysis.

The policy at issue is both an excess liability policy and an umbrella policy. Excess or secondary (as distinguished from primary) insurance coverage is a type of coverage where "liability attaches only after a predetermined amount of primary coverage has been exhausted." *American Special Risk Ins. Co. v. A–Best Products, Inc.*, 975 F.Supp. 1019, 1022 (N.D.Ohio 1997) (quoting *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir.1986)). In the instant case, the predetermined amount after which liability coverage would attach (i.e., the "retained limit") was $3 million.

An excess policy may also provide "umbrella" coverage, as is the case here. Umbrella policies are different from simple excess policies because they are intended to fill gaps in coverage, both vertically (by providing excess coverage) and horizontally (by providing additional primary coverage). In other words, "[t]he vertical coverage provides additional coverage above the limits of the insured's underlying primary insurance, whereas the horizontal coverage is said to 'drop down' to provide primary coverage for situations where the underlying insurance provides no coverage at all." *A–Best Products, Inc.*, 975 F.Supp. at 1022.

The question for this part of the analysis is simply whether, in an excess policy where UM/UIM coverage is impressed upon the policy by operation of law, does the retained limit (i.e., the "trigger") of $3 million apply with respect to that UM/UIM coverage? The defendant argues that it does. Although finding no Ohio case law directly on point with respect to retained limits, the Court has found guidance in the case law that is available, beginning with *Scott–Pontzer*, the case which underlies all of the claims in this lawsuit.

The *Scott–Pontzer* court had three issues before it:

The instant case is hardly one where CNF is offering coverage to a customer walking in off the street. Rather, CNF is covering its own subsidiaries. Furthermore, the UM/UIM coverage which was offered was all part of the same "self-insurance" arrangement under which CNF was required to reimburse the defendant for any and all claims made.

26. Plaintiff also argues that CNF's insurance arrangement is an "insurance pool." The Court finds that this argument need not be addressed because insurance pools, as a form of self-insurance, are *not* insurance. *See, e.g., Ohio Government Risk Management Plan v. County Risk Sharing Authority, Inc.*, 130 Ohio App.3d 174, 719 N.E.2d 992 (1998).

27. In *Duriak v. Globe Am. Cas. Co.*, 28 Ohio St.3d 70, 502 N.E.2d 620 (1986), the Ohio Supreme Court determined that excess coverage must comply with the UM/UIM requirements of § 3937.18 because the Ohio legislature made no exception in the statute with respect to excess coverage. *Id.* at 72, 502 N.E.2d at 622 (approving *Cincinnati Ins. Co. v. Siemens*, 16 Ohio App.3d 129, 474 N.E.2d 655 (1984)).

... The first issue is whether Pontzer, as an employee of Superior Dairy, was an "insured," for purposes of underinsured motorist coverage, under the policies issues to [his employer] Superior Dairy by Liberty Fire [a commercial automobile liability policy] and Liberty Mutual [an umbrella/excess policy]. If he was, then the second issue is whether Pontzer, for coverage to be afforded, would have had to be in the course of his employment at the time of the accident. The third question, which pertains only to the Liberty Mutual policy, is whether, after underinsured motorist coverage is inserted into a policy by operation of law, the exclusions in the policy that have been written in so as to apply to the coverage for liability also pertain to the underinsured coverage.

*Scott–Pontzer*, 85 Ohio St.3d at 662, 710 N.E.2d at 1118.

After concluding that Pontzer *was* an insured under the umbrella policy and that UM/UIM coverage was impressed upon the policy by operation of law for failure to comply with § 3937.18, the court went on to determine that "any language in the Liberty Mutual umbrella policy restricting insurance coverage was intended to apply solely to excess *liability* coverage and not for purposes of underinsured motorist coverage." *Id.* at 666, 710 N.E.2d at 1120 (italics in original). Therefore, although the policy required that one be acting within the scope of his employment to qualify for liability coverage, the court held that no such requirement applied to UM/UIM coverage under the policy.

In reaching its decision, the *Scott–Pontzer* court relied on *Demetry v. Kim*, 72 Ohio App.3d 692, 595 N.E.2d 997 (1991), *jurisdictional motion overruled*, 61 Ohio St.3d 1422, 574 N.E.2d 1093 (1991),[28] where the court of appeals was considering a general business liability policy, not an excess policy. On the sole question of "whether the exclusionary provisions contained in the underlying liability policy apply to underinsured coverage implied by law," *id.* at 694, 595 N.E.2d at 999, the court stated that "there is nothing, absent clear language evidencing an *intent* to do so, to prevent [UM/UIM] coverage from being broader than liability coverage." *Id.* at 698, 595 N.E.2d at 1001 (emphasis added). Applying contract principles,[29] the court concluded that, since the parties had never intended UIM coverage to be part of the policy, none of the negotiated exclusions to the liability portion of the contract could be "impressed upon the underinsured coverage implied by law." *Id.* (cited by *Scott–Pontzer*, 85 Ohio St.3d at 666, 710 N.E.2d at 1120).[30]

**28.** In *Demetry*, the trial court had concluded that the insurance company defendant had been required to offer UM/UIM coverage as part of the general business liability policy and, because of its failure to do so, such coverage was imposed as a matter of law. The trial court then left for a jury the question of whether the decedents were excluded from coverage because of exclusionary language in the policy to the effect that occasional drivers only were covered by the policy. The jury concluded that the decedent driver was *not* an occasional driver. Since the trial court had impliedly ruled in its summary judgment determination that exclusions in the liability policy *were* applicable even to UM/UIM coverage imposed by law, the court entered final judgment in favor of the insurance company. An appeal followed and the court of appeals overruled the trial court with respect to the applicability of exclusionary provisions.

**29.** The *Demetry* court was dealing with an earlier version of § 3937.18 than is involved in the instant case; however, since its decision was based on contract principles, the difference in statute is not relevant.

**30.** *Accord, Luckenbill v. Midwestern Indem. Co.*, 143 Ohio App.3d 501, 507, 758 N.E.2d 301, 305 (2001) ("[w]hen [UM/UIM] coverage is imposed by law, as in ... *Demetry*, it may not be diminished in its scope by circumstantial exclusions which are matters the parties never contemplated"). The *Luckenbill* court was dealing with a question not of coverage

In the instant case, as in *Demetry* and *Scott–Pontzer*, UM/UIM coverage is implied by law with respect to the excess layer of insurance. Under those cases, the $3 million retained limit in the liability portion does not apply to the UM/UIM coverage. Therefore, the umbrella/excess layer "drops down" to cover what the primary policy of self-insurance has not covered. In this case, since there was $500,000 of UM/UIM coverage from the primary layer, the excess layer must pick up where that coverage left off.[31]

Accordingly, for the reasons stated above, plaintiff is entitled to recover under the excess policy the difference between the $500,000 already paid and the $2.35 million in stipulated damages.

## VI. CONCLUSION

For the reasons discussed above, defendant's motion for summary judgment (Doc. No. 23) is denied. Plaintiff's motion for summary judgment (Doc. No. 19)[32] is granted insofar as this Court rules that she is entitled to recover her remaining damages (i.e., the difference between $500,000 and $2.35 million) under defendant's Umbrella and Excess Liability Policy No. MWZU15611.

IT IS SO ORDERED.

---

per se but of conditions precedent to coverage, i.e., notice provisions, in a primary insurance policy (not an excess policy). Although agreeing with *Demetry* that the amount of coverage could not be limited by uncontemplated circumstantial exclusions (e.g., UM/UIM coverage impressed upon the contract by operation of law), the court ultimately concluded that coverage was not available because of a failure by the claimant to give proper notice, that is, to meet a condition precedent. To that extent, *Luckenbill* is distinguishable from the case at bar because there is no issue of conditions precedent in the instant case.

**31.** In actuality, the primary layer only paid $400,000 because the tortfeasor's insurance paid $100,000. The Court notes that this

## JUDGMENT ENTRY

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that summary judgment is granted in favor of the plaintiff and against the defendant Old Republic Insurance Co. in the amount of One Million, Nine Hundred Fifty Thousand Dollars ($1,950,000.00) under defendant's Umbrella and Excess Liability Policy No. MWZU15611. Each party shall bear its own costs. Case closed.

---

$500,000 is serendipitous since UM/UIM coverage was not required *at all* as part of the primary layer of self-insurance. Had there been no "gratuitous" contractual arrangement for the $500,000 in UM/UIM coverage, the Court's present ruling would require the excess layer to pick up the entire $2.35 million in stipulated damages.

**32.** The motion was originally styled as one for "partial" summary judgment because, if granted, the question of damages would have remained for a jury. However, since the parties have now stipulated to the amount of damages (Doc. No. 42), resolution of the motion in plaintiff's favor resolves the entire action.