**AMERICAN SPECIAL RISK INSUR-
ANCE COMPANY, fka Cranford
Insurance Company, Plaintiff,**

v.

**A–BEST PRODUCTS, INC.,
et al., Defendants.**

**No. 1:94CV0755.**

United States District Court,
N.D. Ohio,
Eastern Division.

July 9, 1997.

Ed E. Duncan, Arter & Hadden, Cleveland, OH, for Plaintiff.

Douglas P. Whipple, Elizabeth Anne McNellie, Baker & Hostetler, Cleveland, OH, for Defendant A-Best Products, Inc.

Ronald A. Rispo, David Clifford Lamb, II, Weston, Hurd, Fallon, Paisley & Howley, Cleveland, OH, for Defendant Cincinnati Ins. Co.

Gary D. Hermann, Hermann, Cahn & Schneider, Cleveland, OH, Robert P. Corbin, German, Gallagher & Murtagh, Philadelphia, PA, for Defendant Stonewall Ins.

Gary L. Nicholson, Forrest A. Norman, Gallagher, Sharp, Fulton & Norman, Cleveland, Robert D. Anderle, Porter, Wright, Morris & Arthur, Cleveland, OH, Randall E. Phillip, Deborah Molitz, Provizer, Lichtenstein & Phillips, Southfield, MI, for Defendant Safety Nat. Cas. Corp.

## MEMORANDUM OF OPINION AND ORDER

NUGENT, District Judge.

This matter is before the Court upon a declaratory judgment action filed by Plaintiff American Special Risk Insurance Company (hereinafter American). American named as Defendants A-Best Products, Inc. (hereinafter A-Best), The Cincinnati Insurance Co. (hereinafter Cincinnati), Stonewall Insurance Company (hereinafter Stonewall), and Safety National Casualty Corporation (successor-in-interest to Safety Mutual Casualty Company)(hereinafter Safety National) and sought a declaration of the rights, duties, status and other legal relationships of the parties.

### I. Factual Background

A-Best is a manufacturer of safety clothing and related products that are resistant to high heat. At various points during its existence, A-Best manufactured and sold protective clothing and specialty items made from asbestos-containing cloth, but it discontinued manufacturing and selling asbestos-containing products after December 31, 1984. As a result of these past business practices, however, numerous lawsuits have been filed against A-Best alleging bodily injury as a result of exposure to asbestos. In fact, there are approximately 13,450 lawsuits still pending against A-Best.

Asbestos litigation poses unique challenges to the courts and the parties, not only because of the widespread exposure to asbestos and the resulting thousands of cases, but also because of the nature of asbestos-related in-

juries. The manifestation of disease may not occur until many years after initial exposure to asbestos making it difficult to pinpoint the moment of causation. This determination of the time of injury is often critical in assessing liability because defendants frequently maintained insurance coverage with different carriers over a number of years. Consequently, courts have used different methods to pinpoint causation and apportion liability among multiple insurance companies. *See, J.H. France Refractories Co. v. Allstate Ins. Co.,* 626 A.2d 502, 507 (Pa.1993) (cataloguing cases using exposure theory, manifestation theory, or so-called multiple-trigger theory to trigger liability of the insurer).

Not unlike many defendants in asbestos litigation, A–Best maintained a number of different insurance policies with different companies during the period it manufactured products with asbestos material. Four different insurance companies provided primary insurance coverage successively from 1965 to 1985. Five different companies provided excess insurance coverage for the same period.[1]

A–Best entered into a Claims Handling Agreement with its primary insurance carriers in 1987 to establish, *inter alia*, the allocation of defense expenses and indemnity between the primary carriers and A–Best for asbestos-related personal injury claims. Then, in November 1993, A–Best notified its excess insurers that its primary coverages were nearly exhausted. American then filed this declaratory judgment action seeking a declaration of the rights and obligations of the parties.

## II.  Procedural History

American filed its declaratory judgment action on April 8, 1994. It named A–Best, Cincinnati, Stonewall and Safety National as Defendants and sought a declaration of the rights, duties, status and other legal relationships of the insurers with A–Best under the excess policies. A–Best and Cincinnati each filed Counterclaims against American and Cross Claims against the other parties also seeking declarations relating to the coverages.

With the exception of one issue, all issues between the parties were resolved through settlement before trial. The parties agreed that after the exhaustion of primary insurance, and a contribution by A–Best, American, Cincinnati, Stonewall, and Safety National would each pay a percentage of indemnity and expense costs.

The unsettled issue among the parties involves the proper interpretation of the Stonewall policy, specifically whether the defense of A–Best's asbestos claims are governed by Condition 8 in the main body of the Stonewall contract or an addendum referred to as the Defense Coverage Endorsement. The resolution of this issue will affect the amount of money Stonewall will pay out because under the provisions of the Defense Coverage Endorsement defense expenditures are no included in the calculation of net loss under the policy, whereas under Condition 8, defense expenses are included in net loss. The other excess insurance carriers took the same position as A–Best on this issue and were adverse to Stonewall. Accordingly, this issue was tried to the bench on February 5–6, 1997.[2]

## III.  Discussion

### Types of Insurance Policies

■ In order to properly interpret the insurance contract at issue in this case, it is necessary to first discuss the meaning and purpose of excess insurance in general, as

---

**1.** These excess insurance carriers included American, Cincinnati, Stonewall, and Safety National. A–Best also maintained excess insurance coverage with Integrity Insurance Company, but that company entered into liquidation proceedings and is not a party to this action. Each of these carriers provided excess coverage during different years. Additionally, A–Best did not have any excess coverage during a portion of the relevant time period.

**2.** The Court sat with an advisory jury despite vehement objections by the parties who argued that the issue raised a question of law to be resolved by the Court. Stonewall renewed its objection after the jury rendered a decision in favor of A–Best et al,and found that Stonewall's Defense Coverage Endorsement applies under these circumstances.

However, as the Stonewall policy contains no ambiguity, and the jury sat in a purely advisory capacity, its decision is not binding on this Court. *See,* Discussion, *infra.*

well as the nature of the Stonewall policy in particular. Primary insurance provides an initial layer of protection against liability or loss and its premiums are commensurate with the high degree of risk that the insurance covers. *Revco D.S., Inc. v. Government Employees Ins. Co.,* 791 F.Supp. 1254 (N.D.Ohio 1991). "Excess or secondary coverage is coverage whereby, under the terms of the policy, liability attaches only after a predetermined amount of primary coverage has been exhausted. A second insurer thus greatly reduces his risk of loss. This reduced risk is reflected in the cost of the policy." *Continental Marble & Granite v. Canal Insurance Co.,* 785 F.2d 1258 (5th Cir.1986) (citation omitted).

■ In providing excess coverage, an insurance company may offer "umbrella policies" which differ from standard excess insurance policies in that they are designed to fill gaps in coverage both vertically (by providing excess coverage) and horizontally (by providing primary coverage). *Commercial Union Insurance Co. v. Walbrook Insurance Co., Ltd., et al.,* 7 F.3d 1047, 1053 (1st Cir.1993) (*Commercial Union I*). The vertical coverage provides additional coverage above the limits of the insured's underlying primary insurance, whereas the horizontal coverage is said to "drop down" to provide primary coverage for situations where the underlying insurance provides no coverage at all. *See Commercial Union Insurance Co. v. Walbrook Insurance Co., Ltd.,* 41 F.3d 764 (1st Cir.1994) (*Commercial Union II*). As succinctly stated by the Eleventh Circuit in *Garmany v. Mission Insurance Co.,* 785 F.2d 941, 948 (11th Cir.1986), "umbrella policies have two functions: 1) to provide for a higher limit of liability for those losses typically covered by liability insurance—general liability . . .; [and] 2) to provide for some coverage of those less common losses not typically covered by liability insurance—*e.g.,* malpractice liability, advertiser's liability, blanket contractual liability, world-wide operations liability, etc." (citing *Ridgway v. Gulf Life Insurance Co.,* 578 F.2d 1026 (5th Cir.1978)).

### Contract Provisions at Issue

Knowledge of the foregoing distinctions is helpful in examining the contract provisions at issue in this case, specifically Conditions 5 and 8 of the main body of the Stonewall contract, and the Defense Coverage Endorsement. Conditions 5 and 8 of the policy provide as follows:

**5. Limits of Liability**

(A) The Company shall only be liable for ultimate net loss in excess of either:

   (i) the applicable limits of the policies of underlying insurance set forth in the Schedule of Underlying Insurance; or

   (ii) as respect occurrences not covered by such underlying insurance, but covered under this policy, or where an occurrence is covered by such underlying insurance but in recoverable amounts less than the self-insured retention set forth in Item 3(c) of the Declarations, the amount of ultimate net loss set for in Item 3(c) of Declarations as "Self–Insured Retention."

\*　　\*　　\*　　\*　　\*　　\*

(C) In the event of reduction or exhaustion of the aggregate limits of liability under the policies of underlying insurance by reason of losses paid thereunder, this policy shall:

   (i) in the event of reduction, pay excess of the reduced underlying insurance, and

   (ii) in the event of exhaustion, continue in force as underlying insurance,

*but nothing in this paragraph shall operate to increase the limits of the Company's liability.* (Emphasis added).

**8. Assistance and Cooperation of the Insured.** Except when the aggregate limits of liability under the policies of underlying insurance set forth in the Schedule of Underlying Insurance have been exhausted, the Company shall not be called upon to assume charge of the settlement or defense of any claim made, suit brought or proceeding instituted against the insured, but the Company shall have the right and

shall be given the opportunity to associate with the Insured or the Insured's underlying insurer(s), or both, in the proceeding relative to an occurrence where, in the judgment of the Company, the claim or suit involves or appears reasonably likely to result in liability for indemnity by the Company under this policy, in which event the Insured, any underlying insurer(s) involved and the Company shall cooperate in all things in the defense of such claim or suit.

With respect to any claim made, suit brought or proceeding instituted against the Insured to which the policies of underlying insurance set forth in the Schedule of Underlying Insurance will not apply because of the exhaustion of the aggregate limits of liability thereunder, if such claim, suit or proceeding is one which could result in liability of the Company to indemnify the Insured hereunder for damages, the Company shall assume complete control of the investigation, negotiation, settlement and defense of any such claim suit or proceeding against the Insured. The Insured shall cooperate with the Company and, upon the Company's request, attend hearings and trials and assist in making settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of legal proceedings in connection with the subject matter of this insurance. The Insured shall not except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

The Defense Coverage Endorsement reads:

IT IS AGREED THAT THE POLICY TO WHICH THIS ENDORSEMENT IS ATTACHED IS AMENDED TO INCLUDE THE FOLLOWING ADDITIONAL INSURING AGREEMENT:
DEFENSE, SETTLEMENT, SUPPLEMENTARY PAYMENTS.
AS RESPECTS OCCURRENCES COVERED UNDER THIS POLICY, BUT NOT COVERED UNDER THE UNDERLYING INSURANCE OR UNDER ANY OTHER COLLECTIBLE INSURANCE, THE COMPANY SHALL:

(a) DEFEND IN HIS NAME AND BEHALF ANY SUIT AGAINST THE INSURED ALLEGING LIABILITY INSURED UNDER THE PROVISIONS OF THIS POLICY AND SEEKING DAMAGES ON ACCOUNT THEREOF: EVEN IF SUCH SUIT IS GROUNDLESS, FALSE OR FRAUDULENT; BUT THE COMPANY SHALL HAVE THE RIGHT TO MAKE SUCH INVESTIGATION AND NEGOTIATION AND SETTLEMENT OF ANY CLAIM OR SUIT AS MAY BE DEEMED EXPEDIENT BY THE COMPANY;

(b) PAY ALL PREMIUMS ON BONDS TO RELEASE ATTACHMENT FOR AN AMOUNT NOT IN EXCESS OF THE LIMIT OF LIABILITY OF THIS POLICY, ALL PREMIUMS ON APPEAL BONDS REQUIRED IN ANY SUCH DEFENDED SUIT BUT WITHOUT ANY OBLIGATION TO APPLY FOR OR FURNISH SUCH BONDS, ALL COSTS TAXED AGAINST THE INSURED IN SUCH SUIT, ALL EXPENSES INCURRED BY THE COMPANY AND ALL INTEREST ACCRUING AFTER ENTRY OF JUDGMENT UNTIL THE COMPANY HAS PAID, TENDERED OR DEPOSITED IN COURT THAT PART OF SUCH JUDGMENT AS DOES NOT EXCEED THE LIMIT OF THE COMPANY'S LIABILITY.

(c) REIMBURSE THE INSURED FOR ALL REASONABLE EXPENSES, OTHER THAN LOSS OF EARNINGS, INCURRED AT THE COMPANY'S REQUEST.

*THE COMPANY AGREES TO PAY THE AMOUNTS INCURRED UNDER THIS AGREEMENT. EXCEPT IN SETTLEMENT OF CLAIMS AND SUITS, IN ADDITION TO THE LIMIT OF LIABILITY STATED IN THE DECLARA-*

*TIONS AND SUCH DEFENSE AND SUPPLEMENTARY PAYMENTS SHALL NOT BE INCLUDED AS PART OF THE ULTIMATE NET LOSS, AS DEFINED IN THE POLICY.* (Emphasis added).

In addition to the above-quoted terms, the Defense Coverage Endorsement also provides in pre-printed and smaller type, "All other terms and conditions remain unchanged."

### Issue to be Resolved

It is undisputed that Stonewall's policy constitutes an umbrella policy. A–Best and Stonewall entered into an Umbrella Liability Insurance Contract on October 1, 1982. In addition to this main contract, however, A–Best and Stonewall agreed to various addenda on that date, including a Defense Coverage Endorsement. The dispute between the parties concerns whether the provisions in the main body of the Stonewall policy or the Defense Coverage Endorsement apply to the defense of A–Best's asbestos-related personal injury claims. Resolution of the that dispute, in turn, depends on the interpretation of the phrase "not covered" in the Defense Coverage Endorsement. If Condition 8 of the main contract applies, as argued by Stonewall, the A–Best's defense costs are included in the calculation of ultimate net loss pursuant to Condition and, therefore, act to "erode" the limits of liability. However, if the Defense Coverage Endorsement applies, as argued by A–Best and the other excess carriers, then A–Best's defense costs would be in addition to the limits of liability under the Stonewall policy and thus, would not "erode" those limits. The highlighted portions of Condition 5 and the Defense Coverage Endorsement demonstrate the difference between the so-called eroding limits under the main body of the contract and so-called non-eroding limits under the addendum.

### Analysis

It is well-settled that the interpretation of a contract is a question of law. *Cincinnati Gas & Electric Co. v. FERC,* 724 F.2d 550, 554 (6th Cir.1984). Accordingly, the present matter be determined by this Court without the constraints of the advisory jury's decision.

■ Courts construe insurance contracts in accordance with the same rules governing other written contracts. *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.,* 16 F.3d 684 (6th Cir.1994). Thus, as the Sixth Circuit explained in *Babcock & Wilcox Co. v. Arkwright–Boston Manufacturing Mut. Ins. Co.,* 53 F.3d 762 (6th Cir.1995), this means that "[i]n Ohio, as in most states, a court reviewing an insurance policy must give all the words and phrases in the contract 'their natural and commonly accepted meaning.' *Tomlinson v. Skolnik,* 44 Ohio St.3d 11, 540 N.E.2d 716, 718 (1989)(quoting *Gomolka v. State Auto. Mut. Ins. Co.,* 70 Ohio St.2d 166, 436 N.E.2d 1347, 1348 (1982))."

■ Furthermore, in determining this question of law, the court must be mindful that the law requires that insurance contracts be read as a whole. *Heritage Mut. Ins. Co. v. Ricart Ford, Inc.* 105 Ohio App.3d 261, 663 N.E.2d 1009 (1995). Courts must consider the subject matter and purpose of the agreement, but must not interpret the contract "in a manner that renders any phrase surplusage." *Affiliated FM Ins. Co.,* at 687 (citing *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd.,* 64 Ohio St.3d 657, 597 N.E.2d 1096 (1992), *cert. denied,* 507 U.S. 987, 113 S.Ct. 1585, 123 L.Ed.2d 152 (1993)).

■ Hence, only when the contract is ambiguous, i.e. a term cannot be determined from the four corners of the agreement or the language is susceptible to two or more reasonable interpretations, should the court apply rules of construction relating to ambiguity. *Schachner v. Blue Cross and Blue Shield of Ohio,* 77 F.3d 889 (6th Cir.1996). The doctrine of construing the language against the insurance company does not come into play unless a clause is ambiguous. *Babcock & Wilcox,* 53 F.3d at 766 (citing *King v. Nationwide Ins. Co.,* 35 Ohio St.3d 208, 519 N.E.2d 1380, 1384 (1988)).

■ In this case, Stonewall contends the Defense Coverage Endorsement does not apply because it applies only to the specific instance where the occurrence is "not covered" by the underlying insurance. Stonewall contends that the phrase "not covered"

means that the provisions of the Defense Coverage Endorsement apply only to circumstances where the primary insurance policy did not provide coverage, i.e. where Stonewall acts as the primary insurance as explained as the second function of umbrella insurance in *Garmany, supra*, and not where the primary insurance has been exhausted.

A–Best insists that Stonewall's interpretation is contrary to the ordinary meaning of the terms "not covered." A–Best contends that when the primary insurance is exhausted it will be "not covered" by the underlying insurance because the primary insurance will not afford protection against the remaining asbestos claims and, thus, the Defense Coverage Endorsement applies. In A–Best's view, Stonewall's interpretation is an attempt to change the meaning of "not covered" to "never covered" under the primary insurance.

This debate over the meaning of "not covered" in an insurance contract was addressed by the Fifth Circuit in *Mission National Insurance Co. v. Duke Transportation Co.*, 792 F.2d 550 (5th Cir.1986) wherein the court considered those terms to determine whether an excess insurance carrier had to "drop down" to provide primary coverage upon the insolvency of the primary insurance carrier. The court stated:

> When an excess insurer uses the term "collectible" or "recoverable" it is agreeing to drop down in the event the primary coverage becomes uncollectible or unrecoverable; on the other hand, when an excess insurer uses the term "covered" or "not covered," it is agreeing to drop down only in the event that *the terms of the underlying policy do not provide coverage for the occurrence or occurrences in question.* (Emphasis added).

*Id.* at 553.

Although the context of this decision is not completely analogous to the case *sub judice*, its reasoning is persuasive, particularly after an examination of the entire insurance contract between Stonewall and A–Best. As in *Mission, supra*, the Stonewall policy uses different terms to classify different situations, as most clearly demonstrated in Condition 5. In Condition 5, the policy first refers

to the Company's liability as being in excess of "the applicable limits of the policies of underlying insurance," i.e. exhaustion of the primary policy. *See* Condition 5(A)(i), *supra*. In contrast, Condition 5 of the policy also refers to its liability for "occurrences not covered by such underlying insurance, but covered under this policy." *See* Condition 5(A)(ii), *supra*. Thus, the contract refers to the two different situations which distinguish the two functions of an umbrella policy as explained in *Garmany, supra*,—it will provide vertical coverage when the primary insurance exhausts and it will "drop down" and provide horizontal coverage when the primary insurance does not provide coverage. This distinction illustrates that the phrase "not covered" in this policy refers to a situation different from the exhaustion of primary insurance.

Differences in language which highlight the different attributes of this umbrella policy are also evident in reading the second paragraph of Condition 8 in conjunction with the Defense Coverage Endorsement. Condition 8 refers to situations "to which the underlying insurance ... will not apply because of the exhaustion of the aggregate limits of liability thereunder" whereas the Defense Coverage Endorsement refers to situations "covered under this policy but not covered under the underlying insurance." Accordingly, the contract does not ambiguously use terms susceptible to more than one interpretation, but rather uses distinctly different terms and phrases to address different aspects of its coverage.

Furthermore, a careful examination of the policy reveals that Stonewall's interpretation makes better sense of the policy as a whole. Although the main body of the policy provides defense terms in Condition 8, that provision only applies to situations insured by the primary insurance before the exhaustion of the primary insurance, or situations insured by the primary insurance but after the exhaustion of the primary insurance. Condition 8 does not address situations where Stonewall's policy would provide coverage for occurrences outside the scope of the underlying insurance, i.e. where Stonewall drops down to act as primary insurer.

Therefore, interpreting the Defense Coverage Endorsement as Stonewall suggests does not alter or change the meaning of the contract, but rather adds defense provisions under circumstances where the Stonewall policy, pursuant to the second function of umbrella insurance, provides protection by acting as a primary carrier—a situation not addressed by the main contract.

Accordingly, the phrase "not covered" in the Defense Coverage Endorsement refers to situations of horizontal coverage where Stonewall acts as a primary carrier, and not to situations of vertical coverage where Stonewall provides excess insurance after the exhaustion of the underlying primary insurance. To hold otherwise would render the second paragraph of Condition 8 mere surplusage. Therefore, because the asbestos-related personal injury claims are covered by the terms of the underlying primary insurance, the Defense Coverage Endorsement does not apply, and the defense of those claims is governed by Condition 8 of the main body of the policy.

### JUDGMENT ENTRY

Pursuant to a Memorandum of Opinion and Order of this Court, the defense of asbestos-related claims against A–Best is governed by Condition 8 of the Stonewall policy and not by the Defense Coverage Endorsement.

IT IS SO ORDERED.