OPINION
{¶ 1} Plaintiffs-appellants Cecilia E. Wright and her minor son, James Walter Wright, appeal from a summary judgment rendered against them on their declaratory judgment and breach-of-contract action seeking underinsured motorist benefits under insurance policies issued by defendant-appellee MedAmerica International Insurance, Ltd.
 {¶ 2} The Wrights contend the trial court erred in finding that a 1997 insurance policy issued by MedAmerica to Miami Valley Hospital (Cecilia Wright's employer) was validly cancelled prior to the date of the traffic accident underlying the present litigation. The Wrights also contend the trial court erred in finding that MedAmerica was not required to offer uninsured/underinsured motorist coverage when issuing a 1998 insurance policy to Miami Valley Hospital. We conclude that the 1997 policy was properly cancelled with the mutual assent of the contracting parties. We also conclude that MedAmerica was not required to offer uninsured/underinsured motorist coverage in connection with the 1998 policy, which does not constitute an "automobile liability or motor vehicle liability policy of insurance" as that phrase is defined under the applicable version of R.C. § 3937.18(L). Accordingly, we overrule both assignments of error, and the judgment of the trial court is affirmed.
 I {¶ 3} On July 2, 1999, Cecilia Wright, her husband (James Wright, Jr.), their three-year-old son (James Walter Wright), and her husband's mother (Essie Wright), were passengers in a vehicle driven by her husband's father (James Wright, Sr.).[1] The vehicle struck a concrete culvert on the side of the highway after James Wright, Sr., allegedly lost control. The accident killed James Wright, Sr., Essie Wright, and James Wright, Jr., and injured Cecilia Wright and James Walter Wright.
 {¶ 4} James Wright, Sr., the vehicle's owner, carried motor vehicle liability insurance through State Farm with liability limits of $50,000 per person and $100,000 per accident. The limits of this policy, which included underinsured motorist coverage, were exhausted by payment of $50,000 to another injured passenger (not a party herein) and an agreement to pay $50,000 to Cecilia Wright as executrix of the estate of James Wright, Jr., for his wrongful death, for the benefit of his sisters.
 {¶ 5} On the date of the accident, Cecilia Wright was a part-time employee of Miami Valley Hospital, but she was not acting within the scope of her employment at the time of the accident. Miami Valley Hospital was a named insured under separate 1997 and 1998 excess liability insurance policies issued by MedAmerica. Although the stated policy period for the 1997 policy was July 1, 1997, through July 1, 2000, the policy contains endorsement number 3AB, indicating that it was cancelled effective January 1, 1998. The stated policy period for the 1998 policy was January 1, 1998, through July 1, 2000. The 1997 and 1998 policies do not contain express uninsured or underinsured motorist ("UM/UIM") coverage, and MedAmerica does not claim that it timely offered UM/UIM coverage or that it obtained a timely rejection of UM/UIM coverage under either policy. While the 1997 policy does not include any rejection of UM/UIM coverage, the 1998 policy includes an endorsement, effective April 1, 2000, reflecting Miami Valley Hospital's rejection of UM/UIM coverage. Given that the accident occurred on July 2, 1999, this endorsement was not then in effect.
 {¶ 6} On June 29, 2001, Cecilia Wright, individually and as executrix of the estate of James Wright, Jr., and James Walter Wright, through his mother, filed this action against MedAmerica, alleging that they qualified as insureds and asserting entitlement to underinsured motorist benefits under the 1998 policy. During the course of discovery, the Wrights became aware of the 1997 policy. Although the Wrights did not amend their complaint to include claims under the 1997 policy, the parties stipulated, for purposes of the summary judgment motions, that the Wrights' claims included both the 1997 and the 1998 MedAmerica policies.
 {¶ 7} The parties ultimately filed cross motions for summary judgment. In a February 20, 2003, decision, the trial court sustained the motion filed by MedAmerica and overruled the motion filed by the Wrights. In so doing, the trial court found that the 1997 policy was cancelled prior to the date of the accident, and that the 1998 policy did not qualify as an "automobile liability or motor vehicle liability policy of insurance" under R.C. § 3937.18(L). As a result, the trial court concluded that the Wrights were not entitled to underinsured motorist benefits under either policy. The Wrights then filed this appeal, advancing two assignments of error.
 II {¶ 8} The Wrights' first assignment of error is as follows:
 {¶ 9} "The Trial Court Erred In Denying Plaintiffs' Summary Judgment Motion Seeking UM/UIM Benefits And Granting The Insurer's Summary Judgment Motion As To The 1997 Policy When The Policy Provides Plaintiffs With UM/UIM Coverage By Operation Of Law Under The 1994 Version Of R.C. § 3937.18 And MedAmerica Did Not Show That The Policy Was Properly Cancelled Before The Accident."
 {¶ 10} We review the appropriateness of summary judgment de novo.Koos v. Cent. Ohio Cellular, Inc. (1994), 94 Ohio App.3d 579, 588,641 N.E.2d 265. "Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor." Zivich v. Mentor Soccer Club, Inc. (1998),82 Ohio St.3d 367, 696 N.E.2d 201.
 {¶ 11} On appeal, the Wrights contend that the S.B. 20 version of R.C. § 3937.18 (effective 10-24-94 to 9-2-97) applies to their claims under the 1997 policy, and that underinsured motorist coverage arises by operation of law if the policy was in effect on the date of the accident. In its summary judgment ruling, however, the trial court found that the 1997 policy was cancelled by mutual agreement of MedAmerica and Miami Valley Hospital prior to the accident, so that the Wrights were not entitled to underinsured motorist benefits.[2] In opposition to this conclusion, the Wrights assert that the evidence fails to demonstrate mutual assent to the cancellation.
 {¶ 12} Upon review, we find no error in the trial court's determination that MedAmerica and Miami Valley Hospital mutually agreed to cancel the 1997 policy prior to the accident on July 2, 1999. As noted above, the 1997 policy includes endorsement number 3AB, signed by a representative of MedAmerica,[3] which purports to cancel the policy effective January 1, 1998. MedAmerica cited this endorsement in its summary judgment motion before the trial court. In response, the Wrights argued, as they do now, that the endorsement does not reflect Miami Valley Hospital's assent to the cancellation. In order to rebut this argument, MedAmerica provided the trial court with a reply memorandum incorporating by reference an affidavit from Dale E. Creech, Jr., general counsel for Premier Health Partners.[4] In relevant part, Creech averred as follows:
 {¶ 13} "3. I am familiar with the terms and conditions of the 1997 MedAmerica policy, Policy No. MAI-EX-1002/97 (the 1997 MedAmerica Policy) issued by MedAmerica International Insurance, Ltd. to Miami Valley Hospital, et al. . . .
 {¶ 14} "4. By express agreement of the parties to the 1997 MedAmerica Policy, the 1997 policy was to be cancelled effective January 1, 1998. This agreement was set forth in Endorsement No. 3AB of the 1997 policy."
 {¶ 15} Although the trial court did not identify the evidentiary basis for its finding that MedAmerica and Miami Valley Hospital mutually agreed to cancel the policy prior to the July 2, 1999, accident date, it appears to have relied on the endorsement and Creech's affidavit. The Wrights insist, however, that this evidence did not entitle MedAmerica to summary judgment for two reasons. First, they contend that interpretation of an insurance policy is a matter of law for a court to decide, and the affidavit constitutes an attorney's inadmissible interpretation of the endorsement. Second, they argue that even if the trial court properly considered the affidavit, it fails to demonstrate that numerous other named insureds assented to the cancellation.
 {¶ 16} We conclude that Creech's affidavit does not impermissibly interpret the policy endorsement. Creech simply averred that the parties agreed to cancel the 1997 policy, as memorialized by the endorsement. Furthermore, the numerous other named insureds were not required to give individual assent to the cancellation. As indicated in his affidavit, Creech served as general counsel for Premiere Health Partners. The record reveals that Premiere Health Partners is "a joint operating company over MedAmerica Health Systems," an organization that the Wrights concede operates Miami Valley Hospital. (See Gutman depo., Doc. #19 at 4; Appellants' brief at 6 n. 1). The record also contains uncontroverted evidence that in his capacity as general counsel for Premiere Health Partners, Creech acts on behalf of Miami Valley Hospital. (See, e.g., Gutman depo. at 7-8; Robinson depo. at 6; Appendix to Appellants' brief at Exh. 3, UM/UIM endorsement signature page). Thus, Creech's affidavit establishes that MedAmerica and Miami Valley Hospital mutually agreed to cancel the 1997 policy. Notably, Miami Valley Hospital is the first named insured in that policy. A provision of the policy expressly provides that the first named insured "is authorized to act on behalf of all named insureds and other insureds with respect to the giving . . . of notice of cancellation[.]"[5] (Appendix to Appellants' brief at Exh. 2, p. 40). In light of this provision, Miami Valley Hospital acted on behalf of all insureds when it and MedAmerica mutually agreed to cancel the 1997 policy.[6] Therefore, we reject the Wrights' argument that the cancellation was ineffective because the numerous other named insureds did not consent.[7]
 {¶ 17} Finally, we find no merit in the Wrights' alternative argument that the cancellation failed to comply with various statutory requirements. In particular, the Wrights cite R.C. § 3937.25 and argue that the 1997 policy could not be cancelled except for a reason authorized by statute and pursuant to statutory procedures. The trial court rejected this argument, reasoning that R.C. § 3937.25 and related sections apply only to unilateral cancellation. We agree. Section3937.25 sets forth specific grounds for cancellation of an insurance policy and requires that a notice of cancellation include certain information. Having reviewed this section, we are persuaded that it is intended to protect a party, typically an insured, against unilateral cancellation by an insurance company. In the case before us, the uncontroverted evidence indicates that MedAmerica and Miami Valley Hospital mutually agreed to cancel the 1997 policy. As the trial court properly recognized, parties retain the right to cancel a contract by mutual agreement, and a cancellation by mutual assent is governed by ordinary contract principles. Snell v. Salem Ave. Assoc. (1996),111 Ohio App.3d 23, 31; McGuire v. Mills (Aug. 30, 1999), Ross App. No. 98CA2462. Consequently, the statutory requirements cited by the Wrights have no applicability herein.
 {¶ 18} For the foregoing reasons, we conclude that the trial court properly found that MedAmerica and Miami Valley Hospital mutually agreed to cancel the 1997 policy prior to the July 2, 1999, accident date. Accordingly, the Wrights are not entitled to underinsured motorist benefits under that policy, and we overrule their first assignment of error.
 III {¶ 19} The Wrights' second assignment of error is as follows:
 {¶ 20} "The Trial Court Erred In Denying Plaintiffs' Summary Judgment Motion Seeking UM/UIM Benefits And Granting The Insurer's Summary Judgment Motion As To The 1998 Policy When The Policy Provides Plaintiffs With UM/UIM Coverage By Operation of Law Under The 1997 Version Of R.C. § 3937.18."
 {¶ 21} In support of this assignment of error, the Wrights advance two arguments. First, they contend the trial court applied the wrong version of R.C. § 3937.18 when finding that the 1998 MedAmerica policy issued to Miami Valley Hospital did not qualify as an "automobile liability or motor vehicle liability policy of insurance" under R.C. § 3937.18(L). According to the Wrights, the trial court erroneously applied an amended version of the statute that was enacted after the July 2, 1999, accident, which imposed an additional requirement not found in the earlier version. Second, the Wrights assert that they are insureds under the 1998 policy, which provides underinsured motorist coverage by operation of law.[8]
 {¶ 22} In response, MedAmerica appears to concede that the trial court applied the wrong version of R.C. § 3937.18(L). In a cross-assignment of error, however, it argues:
 {¶ 23} "The trial court erred when it determined that the 1998 MedAmerica policy was an `umbrella policy' as that term is judicially defined by the Second Appellate District."[9]
 {¶ 24} Upon review, we agree that the trial court applied the wrong version of R.C. § 3937.18. The 1998 policy had an effective date of January 1, 1998. Therefore, it was subject to the requirements of the statute as amended by H.B. 261 (effective 9-3-97 to 11-1-99).[10]Ross v. Farmer's Ins. Group of Companies, 82 Ohio St.3d 281,1998-Ohio-381. The H.B. 261 version of R.C. § 3937.18(L) defines an "automobile liability or motor vehicle liability policy of insurance" as either of the following:
 {¶ 25} "(1) Any policy of insurance that serves as proof of financial responsibility, as proof of responsibility is defined in division (K) of section 4509.01 of the Revised Code, for owners or operators of the motor vehicles specifically identified in the policy of insurance;
 {¶ 26} "(2) Any umbrella liability policy of insurance."
 {¶ 27} The later version of R.C. § 3937.18(L)(2), erroneously applied by the trial court, limited the application of the statute to certain "umbrella liability" policies, only, by defining an "automobile liability or motor vehicle liability policy of insurance" as "[a]ny umbrella liability policy of insurance written as excess over one or morepolicies described in division (L)(1) of this section." (emphasis added). Thus, under the H.B. 261 version of the statute any "umbrella liability policy" fits the definition of an "automobile liability or motor vehicle liability policy of insurance." Under the version of the statute erroneously applied by the trial court, however, an umbrella liability policy only fits the definition if it is written as excess insurance over a policy described in § 3937.18(L)(1), to wit: a policy that serves as proof of financial responsibility. The trial court's use of the wrong version of the statute is significant because it found that: (1) the 1998 policy did not serve as proof of financial responsibility under §3937.18(L)(1); (2) the 1998 policy did constitute an "umbrella liability policy of insurance"; and (3) the 1998 policy was not written as excess over a policy that served as proof of financial responsibility. As a result of these findings, the trial court determined that the 1998 policy was not an automobile liability or motor vehicle liability policy of insurance, with the result that MedAmerica was not required to offer UM/UIM coverage.
 {¶ 28} On appeal, the Wrights do not quarrel with the trial court's finding that the 1998 policy does not serve as proof of financial responsibility under R.C. § 3937.18(L)(1), and we find no error in that determination. As the trial court properly noted, in order for a policy to serve as proof of financial responsibility under §3937.18(L)(1), it must assure an "ability to respond in damages for liability" in the event of an accident. See R.C. § 4509.01(K). By its own terms, the 1998 policy does not do so. It is an excess liability policy, providing coverage only after a "retained amount" of $1,000,000 has been paid to a claimant from some other source. An injured party with a claim against Miami Valley Hospital under the 1998 policy cannot recover against MedAmerica for any claim worth less than $1,000,000. Therefore, the 1998 policy does not serve as proof of financial responsibility.
 {¶ 29} The crucial issue is whether the 1998 policy qualifies as an umbrella liability policy of insurance under the H.B. 261 version of R.C. § 3937.18(L)(2). The trial court reasoned that the 1998 policy qualified as an umbrella liability policy despite the fact that it did not require Miami Valley Hospital to purchase underlying insurance:
 {¶ 30} "* * * The 1998 MedAmerica policy itself does not require that the insured purchase underlying insurance to cover the minimum retained amounts of one and two million dollars. However, this fact, in and of itself, does not mean the 1998 MedAmerica policy is not an umbrella policy. This Court takes the view that the 1998 MedAmerica policy was an umbrella policy regardless of whether the insured chose to purchase an underlying policy. Under the 1998 MedAmerica policy, the insured had the option to remain self-insured up to the retained amounts. However, for any claim beyond what would have been the self-insured amount, the MedAmerica policy still would have provided `umbrella coverage.'"[11] (Doc. #44 at 5).
 {¶ 31} Having reviewed the 1998 policy and relevant law, we disagree with the trial court's finding that the policy qualifies as an umbrella liability policy of insurance. It is undisputed that the 1998 policy did not require Miami Valley Hospital to purchase any underlying insurance. The policy expressly provides that MedAmerica's obligation to indemnify Miami Valley Hospital arises "only after the retained amounts have been paid, whether or not the insured obtains insurance with respect to all or part of the retained amount." In other words, the 1998 policy provided Miami Valley Hospital with coverage against claims exceeding a certain "retained amount," but the hospital remained responsible for the retained amount. In this case, Miami Valley Hospital elected to purchase other insurance to cover the retained amount. The 1998 policy did not require Miami Valley Hospital to purchase that insurance, however, and therefore it cannot be said that the 1998 policy provided "umbrella" coverage.
 {¶ 32} In reaching this conclusion, we note first that Ohio law distinguishes between "umbrella" policies and "excess" liability policies.[12] "Umbrella policies are different from standard excess insurance policies in that they are meant to fill gaps in coverage both vertically, by providing excess coverage, and horizontally (by providing primary coverage). [Citations omitted.] `The vertical coverage provides additional coverage above the limits of the insured's underlying primary insurance, whereas the horizontal coverage is said to "drop down" to provide primary coverage for situations where the underlying insurance provides no coverage at all.'" Pillo v. Stricklin, Stark App. No. 2000-CA-201, 2002-Ohio-363. Other Ohio courts also have recognized that umbrella policies provide both vertical coverage when an underlying policy has been exhausted and horizontal coverage to fill gaps in the coverage provided by an underlying policy, whereas excess policies merely provide vertical coverage. See, e.g., McNeeley v. Pacific Employers Ins.Co., Franklin App. No. 02AP-1217, 2003-Ohio-2951; Cincinnati Ins. Co. v.Lang, Lake App. No. 2002-L-063, 2003-Ohio-3267; Ponser v. St. Paul Fire Marine Ins. Co., Licking App. No. 2002CA00072, 2003-Ohio-4377;American Special Risk Ins. Co. v. A-Best Products, Inc. (N.D.Ohio 1997),975 F. Supp. 1019, 1022. Likewise, courts in other jurisdictions also recognize the foregoing distinction between umbrella policies and excess policies as a general principle of insurance law. See, e.g., CommercialUnion Ins. Co. v. Walbrook Ins. Co., Ltd. (1st Cir. 1994), 41 F.3d 761,767 n. 4.
 {¶ 33} In the case before us, we need not dwell on the foregoing distinction because it is widely recognized that "[b]oth true excess and umbrella liability policies require the existence of a primary policy as a condition of coverage." Russ Segalla, Couch on Insurance 3d (1999) 220-37, Section 220:32 (emphasis added); see also National Sur.Corp. v. Ranger Ins. Co. (8th Cir. 2001), 260 F.3d 881, 885 ("True excess and umbrella policies require the existence of a primary policy as a condition of coverage."); Terra Indus. v. Natl. Union Fire Ins. Co. (N.D.Iowa Aug. 27, 2003), 2003 WL 22023105; CNA Ins. Co. v. SelectiveIns. Co. (2002), 354 N.J. Super. A.D. 369, 807 A.2d 247; Penton v. Hotho
(La.App. 1992), 601 So.2d 762, 764-765 n. 3. This is so because "[t]he purpose of both excess and umbrella coverage is to protect the insured in the event of a catastrophic loss in which liability exceeds the available primary coverage." Couch on Insurance, supra, at 220-37, Section 220:32. As a result, "only after the underlying primary policy has been exhausted does the excess or umbrella coverage kick in." Id. at 220-37 to 220-38.
 {¶ 34} The 1998 MedAmerica policy in the present case did not require Miami Valley Hospital to maintain an underlying primary insurance policy. Therefore, the 1998 policy is not a true umbrella policy of insurance. The fact that Miami Valley Hospital voluntarily elected to purchase one or more separate insurance policies to cover the retained amount does not alter this conclusion. As noted above, the relevant inquiry is whether the 1998 policy required the hospital to purchase underlying insurance, not whether it happened to do so. In addition to being supported by the case law cited above, the foregoing conclusion is sound as a matter of policy. In our view, it would be unduly burdensome to require an insurance company, like MedAmerica, to keep tabs on Miami Valley Hospital to determine if and when it purchases underlying insurance to cover the retained amount. If the voluntary purchase of underlying insurance by Miami Valley Hospital could render the 1998 policy an umbrella policy, then an umbrella policy under R.C. §3937.18(L)(2) could arise at any time, ostensibly triggering an obligation on the part of MedAmerica to offer UM/UIM coverage. In our view, a better, and certainly more practical, approach is to look solely to the terms of the 1998 policy to determine whether it required an underlying policy of insurance. Because it did not require underlying insurance to cover the retained amount, the 1998 policy did not constitute an "umbrella liability policy of insurance" under R.C. §3937.18(L)(2). Therefore, MedAmerica was not required to offer UM/UIM coverage, and its failure to have done so did not cause UM/UIM coverage to arise by operation of law.
 {¶ 35} Finally, we find no merit in the Wrights' argument that MedAmerica previously admitted that its 1998 policy came within the scope of R.C. § 3937.18(L) and, therefore, contained UM/UIM coverage at the time of the accident. In support of this argument, the Wrights cite a UM/UIM endorsement issued in 2000, indicating an offer, and Miami Valley Hospital's rejection, of UM/UIM coverage. According to the Wrights, this endorsement implicitly acknowledges that at the time of the 1999 accident, the MedAmerica policy did include UM/UIM coverage by operation of law. We reject this argument for at least three reasons. First, the endorsement does not admit that the 1998 policy qualifies as an "automobile liability or motor vehicle liability policy of insurance" under R.C. § 3937.18(L)(2); and given the unpredictable state of UM/UIM law in Ohio, MedAmerica appears to have been restating the obvious in a policy that plainly was not intended to provide UM/UIM coverage, rather than tacitly admitting that UM/UIM coverage previously existed. Second, and perhaps more importantly, whether the 1998 policy qualifies as an "automobile liability or motor vehicle liability policy of insurance" for which an offer of UM/UIM coverage was required is a question of law for the court to decide. Finally, although R.C. §3937.18(L)(2) required that an insurer offer UM/UIM coverage under certain circumstances, there is nothing in that statute that would prohibit an insurer from voluntarily offering UM/UIM coverage under circumstances in which an offer is not required, and the 2000 endorsement may have reflected a voluntary offer of UM/UIM coverage that was rejected. For the reasons set forth above, we conclude, as a matter of law, that the 1998 policy was not required to include an offer of UM/UIM coverage.
 {¶ 36} Although we agree with the Wrights that the trial court applied the wrong version of R.C. § 3937.18(L)(2) and, in so doing, imposed a requirement not applicable herein, we conclude that this error was harmless, since MedAmerica was nevertheless entitled to summary judgment in its favor. We sustain MedAmerica's cross-assignment of error, and conclude that the 1998 policy is not an umbrella liability policy of insurance under R.C. § 3937.18(L)(2). Because the 1998 policy does not qualify as an "automobile liability or motor vehicle liability policy of insurance" under R.C. § 3937.18(L)(1) or (L)(2), the Wrights are not entitled to underinsured motorist coverage by operation of law. In light of this conclusion, we need not resolve the parties' various other arguments, which were not addressed by the trial court.
 IV {¶ 37} The Wrights' first assignment of error having been overruled, their second assignment of error having been overruled as harmless, and MedAmerica's cross-assignment of error having been sustained, the judgment of the trial court is affirmed.
YOUNG, J., concurs.
[1] For purposes of the trial court's summary judgment ruling, the parties stipulated the facts underlying this litigation.
[2] Given its finding that the 1997 policy had been cancelled prior to the accident, the trial court did not address whether that policy included underinsured motorist coverage by operation of law.
[3] The endorsement contains only one signature line, and a representative of MedAmerica signed it.
[4] The affidavit itself was attached to MedAmerica's memorandum in opposition to the Wrights' motion for summary judgment.
[5] The policy provision authorizing Miami Valley Hospital to act on behalf of all insureds when giving notice of cancellation appears to contemplate a unilateral cancellation. The provision is not expressly limited to unilateral cancellations, however, and we discern no reason for authorizing the hospital to act on behalf of all insureds if the hospital were to desire, unilaterally, to terminate the policy, but not if MedAmerica also desired to do so.
[6] By mutually agreeing to cancel the 1997 policy in accordance with the cancellation endorsement, MedAmerica and Miami Valley Hospital in effect gave each other notice of their respective intent to cancel the policy as of January 1, 1998.
[7] In a footnote, the Wrights suggest that the trial court should not have considered Creech's affidavit in connection with MedAmerica's motion for summary judgment because it was filed as part of the insurance company's memorandum in opposition to the Wrights' motion. We find this argument to be unpersuasive. Although MedAmerica filed the affidavit in opposition to the Wrights' motion, the insurance company also incorporated the affidavit into its own summary judgment reply memorandum by reference. Contrary to the Wrights' argument, Mont. Co. C.P.R. 2.05 II.A.3 did not prohibit MedAmerica from interjecting evidence through its reply memorandum. Although that rule directs moving parties to file supporting evidence with a motion, it does not preclude the introduction of rebuttal-type evidence in a reply memorandum, and we find nothing improper in the introduction of this kind of evidence. Cf. Smith v.Burns Clinic Medical Center, P.C., 779 F.2d 1173 (6th Cir. 1985) (approving a defendant's use of affidavits to respond to issues raised in the plaintiffs' memorandum opposing summary judgment); see also Baugh v.City of Milwaukee, 823 F. Supp. 1452 (E.D.Wisc. 1993), aff'd, 41 F.3d 1510
(7th Cir. 1994) ("It seems absurd to say that reply briefs are allowed but that a party is proscribed from backing up its arguments in reply with the necessary evidentiary material.").
[8] In light of its determination that the 1998 policy did not qualify as an "automobile liability or motor vehicle liability policy of insurance" under R.C. § 3937.18(L), the trial court did not address this additional issue.
[9] As noted above, the trial court rejected this proposition, finding that the 1998 policy did qualify as an umbrella policy, but that it failed to meet an additional requirement that was added to R.C. §3937.18(L) after the date of the accident. Under App.R. 3(C)(2), MedAmerica may support the trial court's summary judgment on grounds that the trial court rejected, i.e., by arguing that the 1998 policy does not qualify as an umbrella policy at all. In other words, the cross-assignment of error "`may be used by the appellee as a shield to protect the judgment of the lower court but may not be used by the appellee as a sword to destroy or modify that judgment.'" Cincinnati Gas Elec. Co. v. Joseph Chevrolet Co., 153 Ohio App.3d 95,2003-Ohio-1367, quoting Parton v. Weilnau (1959), 169 Ohio St. 145, 171. Because MedAmerica is asserting its cross-assignment of error as a "shield" to protect the judgment of the trial court, it was not required to file its own notice of appeal. Id.
[10] As the Wrights properly note, an earlier 1994 version of R.C. § 3937.18 (effective 10-20-94 to 9-2-97) could not apply because it was not in effect when the 1998 policy was issued. Likewise, a later 1999 version of R.C. § 3937.18 could not apply, because it took effect on November 2, 1999, which was after the July 2, 1999, accident.
[11] As noted above, although the trial court found that the 1998 policy qualified as an umbrella liability policy, it also found that the policy was not "written as excess over a policy that served as proof of financial responsibility." As we have explained, supra, the relevant version of R.C. § 3937.18(L)(2) does not contain this additional requirement. Thus, if the 1998 policy qualified as an umbrella liability policy, as the trial court found, then it was an "automobile liability or motor vehicle liability policy of insurance" for purposes of the statute pertaining to UM/UIM insurance, and an offer of UM/UIM insurance was required by that statute.
[12] In Scott-Pontzer v. Liberty Mut. Fire Ins. Co., 85 Ohio St.3d 660,665, 1999-Ohio-292, the Ohio Supreme Court cited an earlier case, Duriakv. Globe Am. Cas. Co. (1986), 28 Ohio St.3d 70, for the proposition that "excess liability insurance must comport with R.C. § 3937.18" and its requirement to offer UM/UIM coverage. We note, however, that bothScott-Pontzer and Duriak involved an earlier version of R.C. § 3937.18
that did not include subsection (L). As noted above, the version of R.C. § 3937.18(L) applicable herein provides that UM/UIM coverage must be offered only if an insurance policy serves as proof of financial responsibility or constitutes an "umbrella liability policy." Thus, under subsection (L), which neither Scott-Pontzer nor Duriak had occasion to address, it appears that a pure "excess liability policy," as defined above, need not comport with R.C. § 3937.18 and its requirement to offer UM/UIM coverage. Rather, insofar as the statute requires an offer of UM/UIM coverage, it applies only to policies that serve as proof of financial responsibility and to "umbrella policies." Although umbrella policies do provide excess liability coverage, they play an additional role by providing primary coverage to fill gaps in the coverage afforded by an underlying policy. See 1 Appleman on Insurance 2d 323-325, § 2.16 Excess Insurance.