JOURNAL ENTRY AND OPINION
{¶ 1} The plaintiffs are members of the Tscherne and Hiltebrant families and, in the case of plantiff Karen Tscherne, as executrix of the estate of Tina Tscherne, who sought a declaration of uninsured/underinsured motorists coverage under insurance policies they held with defendant Nationwide Mutual Insurance Company. Unless otherwise noted, we shall refer to plaintiffs collectively as "Tshcherne." The plaintiffs were either directly involved in a motor vehicle accident in Belgium (the accident took the life of decedent Tina Tscherne), or were seeking damages for loss of consortium resulting from damages that others suffered in the same accident. The court held that a territorial restriction on coverage which limited recovery under the policy to accidents within the United States, Canada, and parts of Mexico precluded coverage for an accident occurring in Belgium. The parties concede there is no issue of material fact and seek a determination of coverage as a matter of law. See Civ.R. 56.
 I {¶ 2} Insurance policies are contracts, and we construe them according to established laws of contract construction without giving any deference to the trial court's interpretation. SeeNationwide Mut. Fire Ins. Co. v. Guman Bros. Farm (1995),73 Ohio St.3d 107, 108; Alexander v. Buckeye Pipeline Co. (1978),53 Ohio St.2d 241, paragraph one of the syllabus. When the contract is an automobile liability insurance policy, we enforce the contract as written, giving the language used in the contract its plain and ordinary meaning. Cincinnati Indemn. Co. v. Martin (1999),85 Ohio St.3d 604, 607.
 II {¶ 3} The Nationwide exclusion states:
 {¶ 4} "TERRITORY. The policy applies in Canada, the United States of America and its territories or possessions, or between their ports. All coverages except Uninsured Motorists apply to occurrences in Mexico, if within 50 miles of the United States boundary. We will base the amount of any Comprehensive or Collision loss in Mexico on costs at the nearest United States point." (Emphasis sic.)
 {¶ 5} Tscherne argues that the clause is vague because the "average individual" would not read the policy to appreciate that he was "on his own" while traveling outside the United States, Canada and parts of Mexico. Tscherne surmizes this vagueness arose because of Nationwide's attempt to use "friendly" policy language in an attempt to avoid alarming its insureds.
 {¶ 6} We see no vagueness in the territorial restriction. There is nothing that the average person would find confusing in the sentence "[t]he policy applies in Canada, the United States of America and its territories or possessions, or between their ports." The sentence is written in the plainest English we can imagine.
 {¶ 7} Moreover, we think it highly ironic, and more than a little specious, for Tscherne to argue that Nationwide's statutory duty to write the policy in plain language lies at the fault of the so-called vagueness employed here. The move toward consumer-friendly policy language was intended to remove ambiguity. See, e.g., R.C. 3902.04. Tscherne's argument would have the effect of repealing that move and inserting language into insurance policies that only lawyers could understand.
 {¶ 8} Tscherne's primary argument relating to the territorial restriction is that it runs afoul of the syllabus to State FarmAuto. Ins. Co. v. Alexander (1992), 62 Ohio St.3d 397, which stated, "[a]n automobile insurance policy may not eliminate or reduce uninsured or underinsured motorist coverage, required by R.C. 3937.18, to persons injured in a motor vehicle accident, where the claim or claims of such persons arise from causes of action that are recognized by Ohio tort law." She argues that the claims set forth by all plaintiffs are claims recognized by Ohio law, so the restrictions must be invalid.
 {¶ 9} There is nothing in Alexander that would invalidate the territorial limits of the policy because those territorial limits do not purport to eliminate or reduce UM/UIM coverage for any cause of action recognized by Ohio tort law. The territorial limitation only acts to define the loci in which coverage applies.
 {¶ 10} Territorial limitations of the kind involved in this case have been found to be valid in a number of jurisdictions, including Ohio. See, e.g., Caba v. State Farm Auto. Ins. Co.
(Mar. 31, 1995), Lucas App. No. L-94-168; Prudential Prop. Cas.Ins. Co. v. Gales (Aug. 7, 1986), Franklin App. No. 86AP-250. See, also, Annotation, Validity of Territorial Restrictions on Uninsured/underinsured Coverage in Automobile Insurance Policies (2002), 55 A.L.R.5th 747 (collecting cases). The following statement from Hall v. Amica Mut. Ins. Co. (1994), 538 Pa. 337,349, cogently states the reasons for finding territorial limitations in automobile policies to be valid and enforceable:
 {¶ 11} "Moreover, Amica argues that it contracted and collected a premium to insure its customer against loss due to uninsured motorists in a clearly stated territory; it did not contract to cover its customer throughout the world including places where uninsured motorist risk is entirely unknown or the known risk is unacceptably high, regardless of a country's traffic rules and regulations, traffic patterns, insurance requirements, even where no motor vehicle insurance is required at all. If uninsured motorist coverage were extended worldwide, the rates of Pennsylvania insurers would necessarily reflect the increased scope of the risk as well as the increased difficulty and expense involved in the investigation of claims. In addition, motorists who do not drive in foreign countries would be required to subsidize the additional costs of underwriting the risk to those who do. We do not think the uninsured motorist law contains an indication of public policy which is clear enough to void a plain, unambiguous territorial limitation clause in an insurance contract." (Citation omitted.)
 {¶ 12} We therefore find the territorial limitation of the Nationwide policy is valid and enforceable. The court did not err by granting summary judgment on that basis.
 III {¶ 13} Two of the Tscherne plaintiffs, Gregory Hiltebrant and Karen Tscherne, sought to collect UM/UIM coverage under their homeowner's coverage. They did so with the recognition that the issue whether a homeowner's policy would permit UM/UIM coverage under a resident employee provision was then being considered by the Ohio Supreme Court. The case they refer to has been decided. In Hillyer v. State Farm Fire Cas. Co., 97 Ohio St.3d 411,2002-Ohio-6662, held at ¶ 26, that "the limited liability coverage that may arise under the residence-employee exception in a homeowner's insurance policy is insufficient to transform the policy into a motor vehicle policy for purposes of former R.C.3937.18(A)." Given this holding, we summarily affirm the court's summary judgment to Nationwide.
 IV {¶ 14} Two Tscherne plaintiffs, Gregory Hiltebrant and Karen Tscherne, had identical "personal umbrella" coverage with Nationwide which contained this language:
 {¶ 15} "5. Loss Payments. We will begin to make payment for an occurrence covered by this policy when the amount, or amounts, in excess of the Required Underlying Limits has been actually paid by or on behalf of the insured ***."
 {¶ 16} Given our affirmation of the court's ruling that Tscherne is not entitled to liability benefits due to the territorial restrictions contained in the policy, the loss payments provision of the umbrella policy would not be invoked under the auto policies because no amount had been "actually paid by or on behalf" of Hiltebrant or Tscherne.
 {¶ 17} Tscherne argues that even if Nationwide is able to avoid coverage under the auto policies, the two umbrella policies will "drop down" to supply benefits to her from the first dollar. To support this argument, she cites to Dolly v. Old Republic Ins.Co. (N.D.Ohio 2002), 200 F. Supp.2d 823, 840, and the following discussion of law:
 {¶ 18} "The policy at issue is both an excess liability policy and an umbrella policy. Excess or secondary (as distinguished from primary) insurance coverage is a type of coverage where `liability attaches only after a predetermined amount of primary coverage has been exhausted.' American Special Risk Ins. Co. v.A-Best Products, Inc., 975 F. Supp. 1019, 1022 (N.D.Ohio 1997) (quoting Continental Marble Granite v. Canal Ins. Co.,785 F.2d 1258 (5th Cir. 1986)). In the instant case, the predetermined amount after which liability coverage would attach (i.e., the `retained limit') was $3 million.
 {¶ 19} "An excess policy may also provide `umbrella' coverage, as is the case here. Umbrella policies are different from simple excess policies because they are intended to fill gaps in coverage, both vertically (by providing excess coverage) and horizontally (by providing additional primary coverage). In other words, `the vertical coverage provides additional coverage above the limits of the insured's underlying primary insurance, whereas the horizontal coverage is said to "drop down" to provide primary coverage for situations where the underlying insurance provides no coverage at all.' A-Best Products, Inc., 975 F. Supp. at 1022."
 {¶ 20} The district court went on to hold that the umbrella policy "dropped down" to fill in the gaps of coverage.
 {¶ 21} Although the terms "excess insurance" and "umbrella policy" have been used interchangeably by some courts, they are distinct terms of art within the insurance business. In Richmond, Rights and Responsibilities of Excess Insurers (2000), 78 Denv.U.L.Rev. 29, 29-31, the differences between excess insurance and umbrella coverage were explained:
 {¶ 22} "An excess policy provides specific coverage above an underlying limit of primary insurance. Excess insurance is priced on the assumption that primary coverage exists; indeed, an excess policy usually requires by its terms that the insured maintain in force scheduled limits of primary insurance. In keeping with the reasonable expectations of the parties, including the insured, which paid separate premiums for its primary and excess policies, excess coverage generally is not triggered until the underlying primary limits are exhausted by way of judgments or settlements. Because an excess insurer's duties to its insured are not triggered until the limits of the underlying primary policy (or policies) are exhausted within the meaning of the excess policy, courts sometimes refer to excess insurance as `secondary insurance,' or as `supplemental' or `supplementary insurance.' Additionally, the first layer of coverage above an SIR is sometimes described as `excess insurance.'
 {¶ 23} "A true excess policy does not broaden the underlying coverage. While an excess policy increases the amount of coverage available to compensate for a loss, it does not increase the scope of coverage. An excess policy may be written on a `stand alone' basis or as a policy that `follows form.' A stand-alone excess policy relies exclusively on its own insuring agreement, conditions, definitions, and exclusions to grant and limit coverage. A following form excess policy incorporates by reference the terms, conditions, and exclusions of the underlying policy. An excess policy that follows form is designed to match the coverage provided by the underlying policy, although some following form policies contain exclusions beyond those found in the primary policy, and policy provisions sometimes conflict. To the extent the language of a primary policy and a following form excess policy differ, the terms of the excess policy control where the excess coverage is implicated. Of course, an insured that purchases two or more concurrent excess policies to insure against large risks may layer both stand alone and following form policies.
 {¶ 24} "An umbrella policy is like an excess policy in that it is written in addition to a primary policy to protect the insured against liability for catastrophic losses that would exceed the limits of affordable primary coverage. Like many excess policies, umbrella policies are written to stand alone. An umbrella policy differs from an excess policy in a critical aspect: an umbrella policy typically insures against certain risks that a concurrent primary policy does not cover. An umbrella policy is thus a `gap filler'; by design, it provides first dollar liability coverage where a primary policy and an excess policy do not. For example, an umbrella policy may insure against `personal injury' when a primary policy only insures against `bodily injury' and `property damage.' By essentially dropping down to provide primary coverage or by filling a gap in primary coverage, an umbrella policy broadens the insured's primary coverage where an excess policy does not. The terms `excess policy' and `umbrella policy' are not synonymous." (Footnotes omitted.)
 {¶ 25} We see nothing in the "personal umbrella policy" that indicates it was written as gap coverage in a manner consistent with Tscherne's argument that coverage would "drop down." As we earlier noted, paragraph 5 in the "conditions" section of the policy states that Nationwide's obligation to pay under the umbrella coverage only arises when an amount in excess "has actually been paid by or on behalf of the insured ***." Because the territorial limitations acted to bar the Tscherne plaintiffs' recovery under the liability policy, the umbrella policy could not be invoked to provide drop down coverage. The terms of the policy cannot be construed to provide coverage as hoped for by Tscherne.
 {¶ 26} We therefore find that the court did not err by granting summary judgment. The assigned errors are overruled.
Judgment affirmed.
Patricia A. Blackmon, J., and Diane Karpinski, J., Concur.